In re NORTHPOINT COMMUNI-
CATIONS GROUP, INC., SE-
CURITIES LITIGATION

And Consolidated Cases.

This Document Relates
To: All Actions.

No. C 01–01473 WHA.

United States District Court,
N.D. California.

May 28, 2002.

Kevin J. Yourman, Esq., Weiss & Yourman, Los Angeles, CA.

Behram V. Parekh, Esq., Weiss & Yourman, Los Angeles, CA.

Joseph H. Weiss, Esq., Weiss & Yourman, New York City.

Reed R. Kathrein, Esq., Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA.

Lesley E. Weaver, Esq., Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA.

Jason T. Baker, Esq., Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA.

William S. Lerach, Esq., San Diego, CA.

Jay L. Pomerantz, Esq., Latham & Watkins, Menlo Park, CA.

Kevin H. Metz, Esq., Latham & Watkins, Menlo Park, CA.

Monica Y. Kim, Esq., Latham & Watkins, Menlo Park, CA.

Lionel Z. Glancy, Esq., Glancy & Binkow LLP, Los Angeles, CA.

Michael Goldberg, Esq., Glancy & Binkow LLP, Los Angeles, CA.

Robert C. Susser, Esq., New York City.

William S. Lerach, Esq., Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA.

Darren J. Robbins, Esq., Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA.

**ORDER: (1) GRANTING IN PART AND DENYING IN PART THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS; AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' REQUEST FOR JUDICIAL NOTICE**

ALSUP, District Judge.

## INTRODUCTION

On December 21, 2001, the Court dismissed the first consolidated complaint in this securities class action upon concluding that lead plaintiff FB Capital Management of Kansas, Inc., had failed to adequately plead falsity as to some statements and facts conducive to a "strong inference" of scienter as to all. Instead, the story presented by the complaint was consistent with a good-faith effort to address custom-

ers' mounting financial troubles by increasing the allowance for bad debt and excluding certain amounts from revenue and earnings. Leave to amend was granted.

Lead plaintiff has now submitted an amended consolidated complaint. Plaintiff claims the new pleading addresses its predecessor's shortcomings. The individual defendants naturally disagree, asserting that the new complaint still fails to satisfy the standards set by the Private Securities Litigation Reform Act of 1995 and *In re Silicon Graphics, Inc.*, 183 F.3d 970 (9th Cir.1999). This order holds that the first amended complaint states a claim with regard to several (though not all) of the statements challenged therein.

## STATEMENT

The facts of this case are set forth in the Court's prior order, *In re Northpoint Comm. Group. Inc., Sec. Litig,* 184 F.Supp.2d 991 (N.D.Cal.2001), and will not be repeated in detail herein. The central thrust of plaintiff's fraud claim is that NorthPoint, a digital subscriber line (DSL) wholesaler, was at least deliberately reckless in reporting inflated and uncollectible revenue; failing to record losses for uncollectible receivables; and identifying as "installed" or "subscribers" certain lines that were actually uninstalled or affiliated with delinquent customers.[1] Furthermore, plaintiff alleges that NorthPoint's overstated condition made its announcements regarding a looming merger with Verizon deliberately reckless, since Verizon would back out of the merger upon learning of NorthPoint's true condition. Significantly, the first amended complaint adds compelling allegations regarding "sham" transactions between NorthPoint and its customers. The complaint is brought under Section 10(b) of the Securities Exchange Act of

1934 and Rule 10b–5 promulgated thereunder. Control-person liability is alleged under Section 20(a) of the Exchange Act. The control-person defendants are Michael Malaga, founder and Chairman of NorthPoint; Elizabeth Fetter, the President and CEO; Michael Glinsky, an Executive Vice President and CFO; and Herman Bluestein, an Executive Vice President and the Chief Development Officer.

## ANALYSIS

Like the initial consolidated complaint, the first amended complaint attacks statements made between August and November 2000. These statements, primarily in press releases, pertain mostly to revenues and earnings for the second and third fiscal quarters of 2000; the merger with Verizon; and customer and line counts. In alleging falsity and scienter, the complaint relies chiefly on: (1) allegations attributed to more than a dozen confidential witnesses; (2) disclosures by competitors and customers; (3) "admissions" made by NorthPoint in a civil suit against Verizon, and Verizon's contra-charges in its answer to NorthPoint's complaint; (4) stock sales by Fetter, Malaga and Bluestein; and (5) the existence of the looming merger with Verizon as a motive for fraud.

The second amended complaint repeats several arguments rejected as insufficient by the December 2001 order, primarily concerning alleged admissions by North-Point, insider sales, and customer and competitor disclosures. Although inadequate on their own, these allegations may support a viable fraud claim when combined with the newly-added facts. Even though this order will focus mostly on the new allegations, its conclusions rely on consideration of the first amended complaint as a whole.[2]

---

1. NorthPoint is in bankruptcy; this action is stayed as to it.

2. This order wishes to make clear at the outset that, notwithstanding plaintiff's assertions,

To avoid needless iterations of briefing and argument, prior to hearing on the present motion to dismiss plaintiff was ordered to submit all facts related to its confidential witnesses that the complaint relied upon in forming its allegations. At hearing, plaintiff was instructed to file and serve all documents in its possession or control relied upon by the complaint and the exhibits incorporated by reference therein. Plaintiff's supplemental submissions are deemed incorporated within the complaint. Defendants were allowed to file a reply brief responding to plaintiff's submissions; they submitted a lengthy memorandum that addressed these filings.

### 1. Motion to Dismiss.

■■ Defendants have moved to dismiss the second consolidated complaint pursuant to FRCP 9(b) and 12(b)(6). A motion to dismiss under FRCP 12(b)(6) should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). To state a claim for a violation of Rule 10b–5, a plaintiff must allege: (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) which proximately caused its injury. *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir.2002). Scienter is a mental state embracing an intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). When attacked pursuant to FRCP 12(b)(6), well-pled allegations in a complaint must be treated as true, and all reasonable inferences drawn in the plaintiff's favor. *See North Star Int'l v. Arizona Corp. Comm'n,*

720 F.2d 578, 580 (9th Cir.1983). Conclusory allegations of law and unwarranted inferences, however, are insufficient to defeat a motion to dismiss. *In re VeriFone Sec. Litig.*, 11 F.3d 865, 868 (9th Cir.1993). When ruling on a motion to dismiss, the district court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the Court takes judicial notice. *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir.1998).

### 2. Private Securities Litigation Reform Act (PSLRA).

■ In 1995, Congress enacted the PSLRA to curb what were perceived as abusive practices in securities-fraud litigation. In raising the bar for securities-fraud suits, the PSLRA toughened the already-stringent requirements for pleading fraud under FRCP 9(b). *Cf. In re Glen-Fed, Inc., Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir.1994). Under the PSLRA, to adequately allege securities fraud a complaint must specify each statement alleged to have been misleading, the reason or reasons why the statement was misleading and, if an allegation is made on information and belief, all facts upon which that belief is formed. 15 U.S.C. 78u–4(b)(1). In other words, the lenient inferences in plaintiff's favor that are normally *de rigeur* in considering a motion to dismiss cannot paper over key factual deficiencies in a securities-fraud complaint.

■■ A complaint must also state with particularity facts giving rise to a "strong inference" that the defendant(s) acted with the required state of mind. 15 U.S.C. 78u–4(b)(2). "While under Rule 12(b)(6)

---

the fact that plaintiff's counsel made similar allegations in a recent suit against a former NorthPoint competitor (Covad) does *not* pro-

vide factual support for the falsity of statements made by NorthPoint, or the scienter of NorthPoint officers.

all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable, as is true when pleadings for other causes of action are tested by motion to dismiss under Rule 12(b)(6).... Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 195–96 (1st Cir.1999) (citations omitted). The allegations in a securities-fraud complaint do not give rise to a strong inference of scienter if the facts pled more strongly support an inference of no wrongdoing. *See In re Guess?, Inc., Sec. Litig.*, 174 F.Supp.2d 1067, 1078 (C.D.Cal.2001); *In re VISX, Inc.*, 2001 WL 210481 at *3 (N.D.Cal. Feb. 27, 2001).[3] In this circuit, the complaint must plead facts conducive to a "strong inference" of some form of intentional misconduct—either actual knowledge of falsity or "deliberate recklessness" as to the truth or falsity of a statement. *In re Silicon Graphics*, 183 F.3d at 977.[4]

### 3. Judicial Notice.

■ In ruling on a motion to dismiss, a court may take judicial notice of a document if it is relied on in the complaint (regardless of whether it is expressly incorporated therein) and its authenticity is not disputed. *Parrino*, 146 F.3d at 706. In this vein, a court may consider SEC filings relied upon in the complaint. *See In re Silicon Graphics*, 183 F.3d at 986.

In connection with the present motion, defendants have submitted three items for judicial notice: (1) Fetter's SEC filings, detailing her sales of NorthPoint stock; (2) NorthPoint's prospectus; and (3) a Form S-1 filed by with the SEC by FlashCom, Inc., a NorthPoint customer. Notice of Fetter's SEC filings (relied on in the complaint) is proper. *Ibid.* As for the other two submissions, defendants would have the Court review them for notice of disputed facts therein, not merely to gauge NorthPoint's challenged disclosures in light of all publicly available information. Given this purpose, they will not be considered in ruling upon defendants' motion.

### 4. Industry Reports.

■ With regard to several statements, the first amended complaint still fails to adequately plead falsity and / or fraud. First, the first amended complaint challenges a statement made in an analyst's report issued on October 26, 2000. That report followed a NorthPoint conference call in which "NorthPoint officers" (none identified by name) discussed the October 26 earnings release. The report provided that NorthPoint "has indicated that it is comfortable with revenue estimates for the fourth quarter and full year 2000" (First Amd. Compl. ¶ 46). The first amended complaint never alleges what those forecasts were, however, or whether or not

---

**3.** The decisions plaintiff cites to in urging a more liberal standard on this point are plainly distinguishable. One, *Koppel v. 4987 Corp.*, 167 F.3d 125 (2d Cir.1999), did not in any way address the "strong inference" standard under the PSLRA. The quoted language from another, *Oran v. Stafford*, 226 F.3d 275, 285 n. 5 (3d Cir.2000), concerned inferences of *falsity* (or in that case, the materiality of an omission), not scienter.

**4.** Plaintiffs argue that the prior order granting defendants' motion to dismiss allowed defen-

dants to use the "dot.com" bust as an excuse for fraud. This is a faulty reading of the order. The "alleged market collapse was merely an example of why a naked allegation," in this case of improper revenue recognition and the use of marketing development funds, "in an ever changing market does not imply, much less sufficiently allege, scienter"—particularly a "strong inference" of intentional misconduct. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir.1991).

they were met. This statement is not actionable.

Similarly, sandwiched between a discussion of a August 2000 press release and NorthPoint's 2Q 2000 10–Q report are paraphrased comments taken from a conference call NorthPoint allegedly convened with analysts on August 8, 2000 (First. Amd.Compl.¶ 38). The complaint does not say who from NorthPoint participated in the call. The complaint also does not allege with adequate specificity the statements that were actually made by North-Point officers; how they were false or misleading; or how they were made with the necessary scienter. Even acknowledging that a corporate officer can be liable for public statements channeled through an analyst, the circumstances of these statements are too poorly pled to lay a foundation for fraud.

### 5. Extension.

The first amended complaint also identifies as a challenged statement a comment by NorthPoint in a Form NT–10–Q filed with the SEC on November 15, 2000 (First.Amd.Compl.¶ 43). The pleading fails to explain why this statement was untrue or misleading, though, and thus fails to state a claim as to it.

### 6. Customers.

■ The first amended complaint alleges that a description of NorthPoint's customer base in its 10–Q report for the second quarter of 2000 was false (First. Amd.Compl.¶ 40(c)). The 10–Q report said, in pertinent part, "We are currently providing or have entered into agreements to provide our services to more than 200 network service providers" (Defs. First RFJN, Exh. B at 11). The first amended complaint says this customer-count was untrue because according to its accounts-receivable reports, NorthPoint had only 182 customers as of August 7, 2000, one week before the filing. This fails to ac-count for the words "or have agreements to provide" in the 10–Q report. If North-Point had reached an agreement to provide services to a customer, but not yet done provided such services or billed therefor, the customer would not show up on an accounts-receivable report. The complaint does not address this, and thus fails to plead with specificity how the statement was inconsistent with the true facts.

### 7. Revenue and Earnings.

Alleged improper revenue recognition is the cornerstone of the first amended complaint. These allegations, rather obviously, bear upon NorthPoint's allegedly fraudulent revenue and earnings announcements. Furthermore, an adequately pled claim going to revenue and earnings would also support the complaint's allegations that NorthPoint was deliberately reckless when it assured investors throughout the class period that the merger with Verizon was on track.

It is not disputed that on November 20, 2000, NorthPoint revised the 3Q 2000 revenue results previously announced on October 26, 2000. Revenue was reduced from $30 to $24 million. No readjustment has ever made been made to the results for the second quarter of 2000. The first amended complaint alleges that *both* the second-quarter and (initial) third-quarter results were false when issued because, *inter alia,* each included substantial amounts of revenue not "reasonably assured of receipt" under GAAP and revenue from "sham" transactions. *Cf. Hockey v. Medhekar,* 30 F.Supp.2d 1209, 1216 (N.D.Cal.1998) ("Properly pled, overstating of revenues may state a claim for securities fraud, as under GAAP, 'revenue must be earned before it can be recognized' ").

As for scienter, plaintiff pleads that the individual defendants were aware of such

significant delinquencies in their customer base before and during the class period that they acted with deliberate recklessness in announcing their initial revenue and earnings totals for the second and third quarters of 2000 and not doing more than creating a $1.43 million allowance for bad debt for the second quarter (up $610,000 from $820,000 the quarter before) and declining to recognize $2.8 million in revenue in the third quarter and increasing the allowance to around $2 million for that quarter. Furthermore, plaintiff alleges specific business practices—most importantly, the trading of "marketing development funds" by NorthPoint for "payment" of delinquent receivables—that, it asserts, strongly suggest that NorthPoint was intentionally inflating its revenues.

**(a) Confidential Witnesses.**

Like the first complaint, in alleging falsity and scienter the second consolidated complaint often speaks through confidential witnesses. The original complaint incorporated allegations attributed to eight confidential witnesses; the first amended complaint, 18 (21 if one includes witnesses brought forward for the first time in plaintiff's supplemental submissions). These allegations are set forth in detail in two exhibits (Exhibit A and B) incorporated by reference into the complaint.[5]

■■■■ Reliance on confidential witnesses is not *per se* improper under the PSLRA, notwithstanding its requirement that a plaintiff plead "all facts" when making allegations based on information and belief. *See In re McKesson HBOC, Inc., Sec. Litig.*, 126 F.Supp.2d 1248, 1271 (N.D.Cal.2000); Order Granting Defendants' Motion to Dismiss, *In re Commtouch Software Ltd. Sec. Litig.*, No. C. 01–0719 WHA at *10 (Feb. 11, 2002). To contribute meaningfully toward a "strong inference" of scienter, however, allegations attributed to unnamed sources must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge. *Commtouch* at *10. *Cf. In re Silicon Graphics*, 183 F.3d at 985 (when relying on internal reports, a proper complaint must contain at least some specifics from those reports as well as such facts as may indicate their reliability).

The original complaint failed to provide these necessary details. It simply recited the eight witnesses' job titles, without offering adequate indications as to their duties while in NorthPoint's employ. The witnesses' allegations were frequently vague or inconclusive. The first amended complaint better addresses the PSLRA's requirement that facts bearing upon falsity and scienter be pled with particularity. It provides each witness's job title and tenure *and*, just as importantly, now describes their responsibilities while at NorthPoint. For example, W1, a NorthPoint account manager, "was responsible for the account development and management of regional internet service providers in numerous western states" (Exh. B at 1). This background detail allows for a better evaluation of each witness's basis of knowledge.

Although some of the new witnesses' allegations are more specific than those relied on in the original complaint, some among the added assertions are vague and fail to adequately identify how the witness came to learn of the information attributed to him or her. In introducing the witnesses, Exhibit B leads with a boilerplate assertion that each of the informants "had direct access to information which supports the statements contained in the complaint" (Exh. B at 1). This is not the same as saying that each witness actually had *firsthand* knowledge of the information at-

---

5. When referring to Exhibit B, this order will refer to Exhibit B as attached to Plaintiff's

Response to the Court's Order Re Supplemental Submissions Dated April 25, 2002.

tributed to them. Specific words used in some disclosures also indicate that the informants are not speaking to their own immediate observations. W9, for instance, *"believed* that [Liz] Fetter was one executive who met with FlashCom to discuss" a delinquency problem (*id.* at 8). Likewise, W8 states that by "October or November 1999, rumors were circulating at North-Point that members of NorthPoint's Board of Directors were threatening to resign unless the delinquencies were made public" (*id.* at 7). If a director made this threat, it is powerful evidence. But can a "strong inference" hinge on a secondhand rumor?

More often, informants' allegations provide no indication through "signal words" whether the witness learned of the underlying facts firsthand or secondhand. A representative example is the statement "There were frequent conference calls between executives at NorthPoint and Flash-Com where the delinquent payments were discussed," attributed to W6 (Exh. B at 5). In some instances, the witness's title and description of duties lends these allegations weight, notwithstanding the failure to set forth how exactly the informant came to discover particular information. For instance, the vagueness in the example immediately above is assuaged somewhat because W6 is identified as "directly responsible for managing certain regional partner ISP accounts, including Flash-Com." It would be expected that he or she would know of conference calls between NorthPoint executives and this client. Yet in other cases, where the nexus between a witness's duties and his or her allegations is less evident, the absence of specific detail going to a basis of knowledge is more troublesome—and saps the

allegations of their strength. This problem is exacerbated by the fact that the ambiguous verbs used in Exhibit B (*e.g.,* "believes" and "was certain") often leave it unclear whether and to what extent the complaint is simply putting a "spin" on what the confidential witness actually said.

■ Finally, in some instances claims attributed to the confidential witnesses— *as laid out in the exhibits incorporated into the complaint*—are not perfectly corroborated by the supplemental documentation plaintiff has provided. For example, one of the key allegations referenced in the complaint is W15's assertion that in either July or August 2000, Zyan gave NorthPoint a check for approximately $500,000, and received a check for $500,000 at the same time (Exh. B at 16). When taken with plaintiff's other allegations (also through confidential witnesses) regarding the alleged misuse of marketing development funds, this allegation suggests a "sham" deal. Plaintiff's supporting documentation, however, indicates that Zyan received no marketing development funds from NorthPoint in July or August; rather, the transaction W15 speaks to appears to have taken place in September 2000.[6] Though arguably a minor difference, *In re Silicon Graphics* stressed the importance of details as indicia of reliability. Similarly, the court need not accept as true statements in a complaint contradicted by supporting documentation incorporated therein. *Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1295–96 (9th Cir. 1998). Discrepancies like these are troubling, and will be taken into account in weighing the allegations attributed to the confidential witnesses.

■ The foregoing guides this order's review of the confidential-witness allega-

6. Similarly, CW2 states that Phoenix Networks first became a NorthPoint partner in August 2000 (Exh. B at 2). According to an aging report dated July 12, 2000, however, Phoenix Networks was already a NorthPoint customer, owing more than $2 million—including $376,923.23 more than 90 days due (Exh. A at 4).

tions. In the first amended complaint, as with the original consolidated complaint, these informants mostly describe internal reports regarding, interactions with, and conversations about delinquent customers. Most, though not all, of the allegations in the original complaint are repeated in the first amended complaint. The new allegations, however, are more compelling. Among the new facts pled, the most important concern customer delinquencies, particularly as reflected in NorthPoint "aging reports"; and NorthPoint "trading" marketing development funds for payment of past-due bills. This order holds that the allegations pertaining to these matters are detailed and substantial enough to state a claim for fraud under the PSLRA with regard to the August and October 2000 revenue and earnings announcements identified at paragraphs 37, 39 and 44 of the first amended complaint.

#### (b) Delinquent Customers.

The amended complaint improves on its predecessor by supplementing its allegations concerning customer delinquencies, and in particular by pleading specific facts regarding "aging reports" distributed within NorthPoint. As discussed in the December 2001 order, plaintiff claims that NorthPoint consciously or recklessly violated GAAP in recognizing revenue not reasonably assured of receipt. Plaintiff argues that NorthPoint promulgated revenue and earnings totals for the second and third fiscal quarters of 2000 that included amounts that obviously would never be paid, well in excess of the allowance. Plaintiff acknowledges that NorthPoint took some steps to address mounting delinquencies, increasing the allowance for bad debt each quarter and excluding some revenue from the third-quarter total an-

nounced on October 26, 2000. It argues, however, that defendants were deliberately reckless for not doing more.

The amended complaint fills in the gaps of the prior pleading in part with several "aging reports" allegedly distributed within NorthPoint up through August 2000. Exhibit A to the complaint provides excerpts from these reports, provided to plaintiff through W9. Unlike the generalized assertions regarding delinquencies offered in the initial complaint, Exhibit A provides necessary details (under *In re Silicon Graphics*) regarding the reports' timing, contents, and distribution. The reports indicate that the backlog in NorthPoint's past-due receivables grew significantly through August 2000 (no details from reports produced later than August 2000 are alleged). The reports, which also provide specific names and amounts owed, provide as follows (Exh. A at 2–5):

- As of June 12, 2000, out of NorthPoint's $20,726,491.64 in accounts receivable, 22.4 percent was 61–90 days past due and 10.57 percent was more than 90 days past due.
- As of July 12, 2000, out of NorthPoint's $26,056,541.77 in accounts receivable, 22.39 percent was 61–90 days past due and 11.98 percent was more than 90 days past due.
- As of July 31, 2000, out of NorthPoint's $29,682,752.95 in accounts receivable, 20.92 percent was 61–90 days past due and 18.47 percent was more than 90 days past due.
- As of August 7, 2000 (one day before the NorthPoint announcement that initiates the class period), out of NorthPoint's approximately $21,484,224 in accounts receivable, 27.98 percent was 61–90 days past due and 22.38 percent was more than 90 days past due.[7]

---

7. Exhibit A does not provide the precise amount of total accounts receivable as of August 7. Since it provides the amount past due and its percentage of the overall total, however, the total receivables can be determined.

- As of August 23, 2000 (the last report to which plaintiff claims to have access), out of $30 million in receivables, 18.5 percent was 66–90 days past due, and 13.55 percent was more than 90 days past due.

The past-due customers included several of NorthPoint's largest clients, such as FlashCom and Phoenix Networks. The aging reports show improvements in some of these accounts. FlashCom owed $4.65 million as of June 12, but only $3.46 million as of July 31, and even less—$2.47 million—as of August 7. The reports also reflect a marked build-up of particularly delinquent customers, however. As of June 12, 2000, approximately $2.19 in receivables were more than 90 days due. As of July 31, 2000, this figure had more than doubled, to $5.48 million. One week later, right before NorthPoint's release of its second-quarter results, it stood at $4.81 million. Notwithstanding this significant increase, NorthPoint increased its allowance for bad debt for the second quarter from by only $610,000, from $820,000 to $1.43 million.

Even though GAAP allows for a reasonable range of opinions regarding revenue recognition, see *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426–27 (9th Cir.1994), these and the other facts pled would lay an adequate factual foundation for the falsity of the second-quarter totals (the falsity of the third-quarter figures announced on October 26 is not in dispute). The same is not necessarily true for scienter. A GAAP violation is not always tantamount to fraud. *Ibid.* To plead scienter, a plaintiff must present facts summing to at least deliberate recklessness, defined as follows:

> [R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and

which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it.

*In re Silicon Graphics*, 183 F.3d at 976, *quoting Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir.1990). Given the steps NorthPoint did take to address delinquencies, such as *refusing to accept new orders from certain delinquent customers* (though apparently not Zyan, at least according to W18) and increasing the allowance and reserve, the facts pled regarding the increase in receivables alone would perhaps not suffice to establish a "strong inference" of sufficiently culpable misconduct in failing to do more.

### (c) Marketing Development Funds.

The amended complaint, however, also includes other allegations that bear both on falsity and scienter regarding the revenue and earnings announcements. Through its confidential witnesses, the original complaint alleged that NorthPoint had practice of giving ISP customers "marketing development funds," or MDF, which the customers would supposedly use to attract new clients of their own. The mere existence of such a practice, the December 2001 order held, did not generate a strong inference that defendants were promulgating false revenue and earnings figures knowingly or with deliberate recklessness. The first amended complaint adds important details to the MDF allegations. These new facts, taken as true, suggest that NorthPoint's MDF program was not just part of a flawed-in-hindsight marketing strategy, but a deliberate scheme to inflate the company's revenues. This, in turn, substantiates plaintiff's other averments of intentional misconduct.

According to the first amended complaint, NorthPoint's strategy stressed the maximization of corporate revenue and market share above all else. The com-

plaint alleges that in pursuit of this goal NorthPoint resorted to fraud by incorporating into its quarterly totals revenue not reasonably assured of receipt and by inflating revenue though a variety of practices. Both had the effect of making the 2Q and initial 3Q financials false. One practice NorthPoint adopted was to offset customers' delinquent receivables by "trading" MDF for past-due bills. In effect, the complaint alleges, NorthPoint was purchasing revenue from its nominal customers.

Several informants speak to a misuse of MDF. Although each of these allegations include at least one flaw, when taken together they are acceptably credible and particularized to state a case that MDF was improperly used by NorthPoint to inflate revenues. One witness, W15, is identified as NorthPoint's account supervisor on the Zyan account from May 2000 through the end of the class period. According to plaintiff, W15 states that North-Point credited MDF against an ISP's outstanding receivables balance. "At least two times W15 knew of specifically, North-Point gave a check for MDF funds to Zyan and received a check in return at the same time" (Exh. B at 16). W15 recalls one "swap" of $500,000 checks as having occurred in July or August 2000. As discussed earlier, plaintiff's documentation suggests that the transaction actually took place in September 2000.

Another witness, W10, a sales-support manager responsible for collections of delinquent accounts of NorthPoint's smaller ISPs during the class period, provides that in "late 2000" he wrote off some debt where ISPs owed NorthPoint for services rendered, and NorthPoint owed MDF (Exh. B at 12). W10 does not say that the debt was written off *because* NorthPoint owed MDF, however. A third informant, W20, also speaks to MDF swaps with Zyan. He or she is identified as Zyan's

Controller and Chief Financial Officer during the class period. This witness states that on or about June 8, 2000, NorthPoint and Zyan entered into a new sales agreement "pursuant to which Zyan could offset its accounts payable to NorthPoint with MDF owed by NorthPoint" (*id.* at 20). "Consistent with this agreement," W20 reports, "Zyan deducted MDF amounts from amounts payable beginning in June 2000," and W20 signed the payable checks reflecting these deductions (*ibid.*). Lastly, W14—identified as "employed at the vice presidential level at NorthPoint throughout the Class Period" and "responsible for supervising the internal sales team and sales operations"—provides that (Exh. B at 15):

Many ISPs would refuse to pay their outstanding bills to NorthPoint until they had received their marketing development funds. Sometimes they would come to an agreement where the ISP would wire transfer money to North-Point and then NorthPoint would wire transfer marketing development funds back to the ISP.

Based on his presence at meetings where MDF was discussed, and his knowledge of NorthPoint's negotiations with customers, W14 stated that MDF was part of NorthPoint's business model as early as January 2000. When ISPs complained about not getting MDF funds, they would threaten to move their lines somewhere else. NorthPoint then arranged swapping arrangements with some of its customers, so that MDF was arranged for payments from North-Point's customers. W14 recalled that Verio and FlashCom, in addition to Zyan, engaged in swapping.

These allegations do not speak to any *particular* "swapping" transactions with specific customers.

Although each allegation is slightly flawed, taken together they speak to more than just unfounded office gossip or mistaken understandings of a foolish but not illegal use of MDF by NorthPoint.[8] A complaint cannot plead fraud by simply repeating vague rumors. But here, taken along with plaintiff's other allegations going to scienter, the facts pled regarding sham transactions—suggesting a pattern of shady revenue-recognition practices within NorthPoint—adequately support plaintiff's claim of fraud in NorthPoint's second- and third-quarter financial statements for 2000. So too do plaintiff's allegations regarding revenue recorded from "Billed But Not Installed" lines, addressed elsewhere in this order. Of course, with the action stayed as to NorthPoint, it remains to be seen whether plaintiff has adequately pled scienter as to the individual defendants. That key issue will also be taken up later in this order.

### 8. Verizon.

This order now turns to the challenged statements concerning the Verizon merger. As discussed in the December 21 order, NorthPoint maintained throughout the class period that the merger with Verizon would be completed. It continued to publicly profess as much even after disclosing its second-quarter revenue and earnings revision. Neither the original nor the amended complaint ever alleges that Verizon told anyone at NorthPoint that the merger would *not* proceed at any time prior to Verizon's public announcement of its withdrawal on November 29, 2000. The issue, rather, is whether North-Point was deliberately reckless in saying the merger *would* proceed throughout the class period notwithstanding their questionable revenue recognition practices, which were allegedly withheld from Verizon. In other words, the first amended complaint asserts that NorthPoint's fraudulent withholding of information from Verizon in the merger negotiations made the deal a house of cards that would inevitably come tumbling down.

The initial consolidated complaint failed to instill a strong inference of scienter with regard to the merger announcements. This was particularly true because the complaint's allegations with regard to revenues were (at that time) consistent with a good-faith effort to address customer delinquencies by increasing the allowance for bad debt and revenue exclusion. Thus NorthPoint could have had reason to believe its revision (which was ultimately invoked by Verizon as the basis for reneging on the deal) fell within a "safe harbor" for "matters generally applicable to ... the data industry" found within the Merger Agreement with Verizon (Defs. First RFJN Exh. G at 77).

The conclusion, discussed above, that the first amended complaint adequately alleges fraud with regard to NorthPoint's financials materially alters the analysis. Although a rapid but otherwise innocent worsening of business conditions might be an industry-wide condition, allowing NorthPoint to remain confident that the deal would close, outright fraud cannot be so readily excused. In other words, NorthPoint could not reasonably believe that its own fraud would be immunized by the carve-out. In fact, the Merger Agree-

---

8. W9 also discusses the exchange of MDF for past-due payments, but the allegations attributed to this witness are weak: "By June or July of 2000 it *appeared* that NorthPoint would pay MDFs to its partners, and the partners would then 'pay' some portion of the outstanding debt to NorthPoint in a similar or smaller amount. W9 *felt* that they were just trading money" (Exh. B at 9) (emphasis added). The lack of detail means that this comment has little weight on its own, though it does support the other, more tangible allegations.

ment made Verizon's duties subject to NorthPoint's representations and warranties, including a warranty that all of NorthPoint's financial filings with the SEC contained no material misstatements or omissions (*id.* at 24, 68). If it is true that NorthPoint fraudulently enhanced its revenues and customer count, it had no basis for believing the merger would proceed, and statements made anticipating the merger were deliberately reckless.

### 9. Lines.

Next, the first amended complaint addresses statements pertaining to North-Point's "line counts." On August 8, 2000, a NorthPoint press release provided that the "number of NorthPoint DSL subscribers grew 50 percent in the second quarter of 2000 to 62,000 *subscribers* from 41,300 subscribers as of March 31, 2000" (First Amd. Compl. ¶ 37). On October 26, 2000, North-Point announced that it "had 87,300 cumulative lines, a 41% increase over its 62,000 cumulative *installed* lines at June 30, 2000" (*id.* at ¶ 44(b), (d)) (emphasis added). Plaintiff now alleges that these announced totals were misleading because they included lines known within NorthPoint as "Billed But Not Installed" (or "BBNI") as well as many thousands of lines associated with delinquent customers.

The more damning allegation concerns BBNI. NorthPoint's stated revenue-recognition policy was to record revenue once a line was "installed." But, pointing to the plain language of the acronym, the complaint asserts that NorthPoint recorded revenue from BBNI lines and included them in their line count even though they had not actually been installed, contrary to company policy. According to plaintiffs, these lines were added to quarterly totals primarily to inflate NorthPoint's line counts, seen by analysts as a key reflection of the company's health. Plaintiff says that the inclusion of 2,740 BBNI lines in the 62,000–line total announced for the

second quarter of 2000 was material because analysts had expected NorthPoint to announce 60,000 installed lines; only by creating the BBNI classification did it meet and surpass this expectation.

Several of the confidential witnesses speak to BBNI lines. According to W14, the NorthPoint vice-president, a line was BBNI if a bill was sent before a connection was operational (Exh. B at 14). Another witness (W9) states that the BBNI category was established no later than June 2000, that 2,740 BBNI lines were included in the cumulative line totals announced for 2Q 2000; and that 7,000 BBNI lines were expected in the third quarter (*id.* at 10). This witness also recalls participating in conference calls in which Fetter discussed BBNI (*id.* at 11). Plaintiff has also provided extensive documentation regarding the BBNI category, which for the most part confirms its witnesses' allegations.

Defendants argue that BBNI was perfectly innocent, that it represented a class of lines where NorthPoint had done its installation work for the end-user, but NorthPoint's ISP customer had not yet done its own work to ensure the end-user would be linked to the Internet. Even if this argument could be accepted, North-Point's public announcements simply spoke to "subscribers" and "installed" lines. A reasonable reading of "subscriber" is someone to whom service is being rendered. An "installed" line, likewise, is sensibly interpreted as a fully-installed connection, not one where the end-user is still waiting in vain for the ISP to complete the link. Although a challenged statement that is not false or misleading does not become actionable merely because it is incomplete, *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir.2002), it is reasonable for plaintiff to assert that the incorporation of BBNI lines into publicly announced totals of "subscribers" and "in-

stalled lines" affirmatively created a misleading impression of a state of affairs that differed in a material way from the one that actually existed, *see Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir.2002). Plaintiff's line-count claims, too, shall proceed.

### 10. Scienter.

■ Finally, the individual defendants assert that even if plaintiff has pled facts suggesting that wrongdoing was afoot within NorthPoint, it has failed to plead particularized facts generating a "strong inference" that any of *them* acted with scienter. It is true that for the most part the confidential-witness disclosures do not provide powerful *direct* evidence of scienter. A plaintiff may rely on circumstantial evidence, however, if that evidence creates a "strong inference" of fraud. *In re Silicon Graphics,* 183 F.3d at 986. And significantly, upon the laying of a proper factual foundation that information was known within a corporation, it may be inferred that facts critical to a business's core operations or an important transaction are known to a company's responsible officers. *In re Northpoint,* 184 F.Supp.2d at 998.

■ This order holds that (at least for pleading purposes) it can be inferred that both Fetter (the CEO) and Glinsky (the CFO), by virtue of their positions within NorthPoint, would be aware of issues including NorthPoint's accounts-receivable problem, an MDF scheme and the inclusion of BBNI lines in the quarterly totals. Not coincidentally, these are the two defendants most often discussed as "in the know" by the confidential witnesses. These informants allege more than "specific acts of fraud committed by certain employees, which would likely be hidden from senior executives," as defendants claim (Reply 10). Rather, they speak to practices falling neatly within Fetter and Glin-

sky's presumptive bailiwicks. Indeed, given the confidential-witness allegations pled, it strains credulity to believe that in a corporation of NorthPoint's size Fetter and Glinsky would not have been aware of accounts receivable delinquencies, MDF transactions or improper accounting of BBNI lines. Furthermore, given the allegations and documentation provided by plaintiff, a sufficiently strong inference exists that Fetter and Glinsky knew or were deliberately reckless toward the fact that the revenue, earnings and line-count announcements and public statements regarding the Verizon merger were false or misleading.

The more difficult question concerns Malaga (the Chairman and former CEO) and Bluestein (the Chief Development Officer). The allegations supporting an inference of scienter as to these two defendants is thin. Malaga is alleged to have sold 2.8 percent of his NorthPoint shares during the class period; Bluestein 5.5 percent. These are not particularly suspicious divestitures. *See Ronconi v. Larkin,* 253 F.3d 423, 435 (9th Cir.2001). Malaga's other asserted motive for fraud was to save the company he founded; Bluestein allegedly had a motive because he "was tasked with finding partners and making deals work" (First.Amd.Compl.¶ 41(a)). These are weak allegations, too. No particularized facts are pled suggesting that Malaga or Bluestein's duties within North-Point brought them into close contact with receivables issues, MDF, BBNI lines, or other fraudulent conduct.

In fact, whereas the informants' allegations are replete with assertions from witnesses who were "certain" Fetter and Glinsky knew about BBNI, MDF swapping, *etc.*., when it comes to Malaga and Bluestein the witnesses are practically silent—to paraphrase Arthur Conan Doyle, they are the dogs that *didn't* bark. Fol-

lowing are the confidential-witness allegations that mention either of these defendants. First is this allegation from W9:

> W9 reported to the controller and to the Vice President of Finance.... W9 had the impression that Glinsky was upset about the status of the accounts receivable throughout the Class Period. W9 also perceived that defendants Fetter, Glinsky and Bluestein knew about the receivables problem based on numerous conversations W9 had with other individuals at the Company, including the Vice President of Finance and the individual who took over accounts receivable when W9 transferred to the IT department.

This vague allegation ("perceived") and does little to link Bluestein to fraud. The witness never describes what Bluestein knew about a receivables "problem," never says when Bluestein knew of such a "problem," and never pins down what the "problem" actually was. The next allegation to mention Malaga and Bluestein is attributed to W14:

> NorthPoint's senior management held weekly meetings which W14 occasionally attended. Other executives who attended these meetings included Fetter, Malaga, Bluestein, Glinsky, Chief Operating Officer Mike Makieve, Ann Zeichner and Shellye Archembeau, as well as other individuals at the executive level. Topics discussed included sales, problems with accounts receivables, dying ISPs, lines that were "billed but not installed" and the status of the merger.

This witness does not say he or she ever attended a meeting at which Malaga and / or Bluestein was present *and* at which problems with accounts receivables, BBNI, or other matters were discussed. This, as well as the lack of particularity in this allegation, means that it adds little toward an inference of scienter. Lastly, there is this allegation from W18 (identified as a "senior executive officer at Zyan Communications before and after the Class Period"):

> In September 2000, Whitey Bluestein telephoned the COO of Zyan to discuss Zyan's delinquency. Bluestein proposed to the COO that NorthPoint purchase some of Zyan's more profitable customers to pay off Zyan's debt. Zyan did not agree to this deal. W18 learned of this conversation from the COO.

The facts of the alleged conversation, assumed true, do not strongly suggest that Bluestein was involved in the fraudulent inflation of revenues. As opposed to the sham MDF transactions, the deal Bluestein allegedly proposed was a real exchange of valuable Zyan assets for money to be used to pay its debt to NorthPoint.

All in all, these allegations, taken with the other facts pled in the complaint, are too vague and weak to add up to a strong inference that Malaga or Bluestein was enmeshed in a fraud as anything more than control persons (see below). The Rule 10b–5 claims against them must be dismissed. *See In re Cylink Sec. Litig.,* 178 F.Supp.2d 1077, 1084 (N.D.Cal.2001).

**11. Section 20(a).**

Even though the Rule 10b–5 claims against Malaga and Bluestein fail, these two defendants are not dismissed from this action. Plaintiff also brings a claim against all defendants as control persons under Section 20(a) of the Exchange Act. To state a prima facie case under Section 20(a), a plaintiff must allege (1) a primary violation of the federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator. As discussed above, plaintiff has met its pleading burden as to the first element. With regard to the second, "[w]hether [the defendant] is a controlling person is an 'intensely factual question,' involving scru-

tiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Kaplan v. Rose,* 49 F.3d 1363, 1382 (9th Cir.1994). "To establish the liability of a controlling person, the plaintiff does not have the burden of establishing that person's scienter distinct from the controlled corporation's scienter." *Arthur Children's Trust v. Keim,* 994 F.2d 1390, 1398 (9th Cir.1993).

The complaint alleges that all of the individual defendants acted as controlling persons of NorthPoint. "By reason of their positions as officers and directors of NorthPoint, and their ownership of North-Point stock, the defendants had the power and authority to cause NorthPoint to engage in the wrongful conduct complained of therein" (First Amd. Compl. ¶ 66). Although this boilerplate is arguably too vague to support a claim for control-person liability, *see In re McKesson HBOC,* 126 F.Supp.2d at 1277, other decisions have held otherwise, *see, e.g., In re Cylink,* 178 F.Supp.2d at 1089. Furthermore, North-Point is the only primary violator any of the defendants are alleged to control. Neither side has briefed what the effect of NorthPoint's bankruptcy, and the stay as to it, has on this allegation. In light of defendants' failure to brief the issue, and since this order has already found that Rule 10b–5 claims against two NorthPoint officers (presumably acting as its agents) shall proceed, neither Malaga nor Bluestein will be prematurely released from control-person liability at this stage. *See In re Cylink,* 178 F.Supp.2d at 1089.

### CONCLUSION

The supplemental filings concerning confidential witnesses are deemed incorporated within the first amended complaint. This pleading states a claim as to (1) the challenged revenue and earnings statements issued on August 8, 2000, August 14, 2000, and October 26, 2000, found at paragraphs 37, 39 and 44 of the first amended complaint; (2) the statements pertaining to the Verizon merger at paragraphs 37, 42, 44 and 49 of the complaint; and (3) the line-count totals released on August 8, 2000, August 14, 2000, and October 26, 2000, at paragraphs 37, 39 and 44 of the complaint. The complaint fails to state a claim with regard to all other statements. The claims brought against Malaga and Bluestein under Section 10(b) and Rule 10b–5 are dismissed. The control-person claims against all defendants still remain. The Court will issue a discovery schedule and trial dates by separate order.

**IT IS SO ORDERED.**