DRUSKIN, et al., Plaintiff,

v.

ANSWERTHINK, INC.,
et al., Defendants.

Civ. No. 02–23304.

United States District Court,
S.D. Florida.

Jan. 5, 2004.

Maya S. Saxena, Milberg Weiss Bershad, Hynes & Lerach LLP, Boca Raton, FL, Marc A. Topaz, Schiffrin & Barroway, Bala Cynwyd, PA, Jules Brody, Stull Stull & Brody, New York, NY, Howard Coates, Johnathan Stein, Cauley Geller Bowman & Coates, LLP, Boca Raton, FL, Mel E. Lifshitz, Joseph R. Seidman, Bernstein Liebhard & Lifshitz, New York, NY, Alfred G. Yates, Jr., Law Office of Alfred G. Yates, Jr., P.C., Pittsburgh, PA, Brian J. Robbins, Marc M. Umeda, Robbins Umeda & Fink, LLP, San Diego, CA, Robert I. Harwood, Wechsler Harwood LLP, New York, NY, Robert Randall Adler, Milberg Weiss Bershad Hynes & Lerach, Boca Raton, FL, Charles J. Piven, Baltimore, MD, for Plaintiffs.

Todd R. Legon, S. Daniel Ponce, Wallace Bauman Legon Fodiman, Ponce & Shannon, P.A., Miami, FL, Michael D. Torpey, James E. Burns, Jr., James N. Kramer, Clifford Chance U.S. LLP, San Francisco, CA, for Defendants.

### ORDER DISMISSING CONSOLIDATED AMENDED COMPLAINT WITHOUT PREJUDICE

GOLD, District Judge.

### I. Introduction

THIS CAUSE is before the Court upon Defendants' Motion to Dismiss (DE # 48, filed July 15, 2003) Plaintiffs' Consolidated Amended Complaint (DE # 42, filed May 9, 2003). Plaintiffs filed their Opposition to the Motion to Dismiss (DE # 59) on July 15, 2003, and Defendants filed a Reply (DE # 64) on September 15, 2003. Oral argument was held on October 24, 2003.[1] Upon review, the Motion is GRANTED, and the Consolidated Amended Complaint ("Complaint") is DISMISSED WITHOUT PREJUDICE, for the reasons stated below.

### II. Jurisdiction

The Court has jurisdiction pursuant to 15 U.S.C. § 78aa (the Securities Exchange Act of 1934, also referred to as the "Securities and Exchange Act" or "Act") and 28 U.S.C. § 1331 (federal question jurisdiction).

### III. Factual Background[2]

This is a class action brought on behalf of all purchasers of common stock of De-

---

1. The transcript of the Oral Argument was filed on October 28, 2003 (DE # 67). Citations to the transcript will be made in the following manner: "Transcript at" and then the relevant page number.

2. For the purposes of the Motion to Dismiss, the facts alleged in the Complaint are accepted as true. See Cheney v. Cyberguard Corp., No. 98–6879–CIV, 2000 WL 1140306, at *1 n. 2 (S.D.Fla. July 31, 2000) (citing Hunnings v. Texaco, Inc., 29 F.3d 1480, 1483 (11th Cir. 1994)).

fendant Answerthink, Inc. ("Answerthink") during the period beginning February 8, 2000 and ending April 25, 2002 (the "Class Period"). Consolidated Amended Complaint ("Complaint") ¶ 1. Plaintiffs allege two causes of action. Count alleges violations of Section 10(b) of the Securities Act and Count II alleges violations of Section 20(a) of the Act.

## A. The Defendants and Related Entities

Answerthink is a business and technology consulting firm with offices in Miami, Florida. Complaint ¶¶ 25, 19. The remaining Defendants (collectively referred to as "Individual Defendants") served in the following capacities during the Class Period Defendant John F. Brennan was Answerthink's Executive Vice President and Chief Financial Officer; Ted A. Fernandez was Chairman and Chief Executive Officer; Allen A. Frank was President; and Edmund R. Miller, William Kessinger, and Bruce Rauner were members of the Board of Directors. Id. at ¶ 21. Defendants Miller and Kessinger also served as members of the Audit Committee, which met at least eight times during the Class Period. Id. at ¶ 39.

Defendant Miller founded Interprise Technology Partners ("ITP") in January 1999. Id. at ¶ 42. ITP's principals include Miller, Fernandez, and Rauner. Id. at ¶ 43. Frank, Fernandez, and Rauner served on ITP's Advisory Board. Id. During the Class Period, ITP's portfolio companies included World Commerce Online ("WCOL"), eSavio, Inc ("eSavio"). Parts Locators International, Inc. ("International Parts" or "I–Parts"), and VisualPlex, Inc. ("VisualPlex"). Id. at ¶ 42.

## B. Summary of Cause Action

Plaintiffs allege that Defendants issued a series of false and misleading statements announcing "record" financial results during the Class Period. Id. at ¶ 1. Defendants allegedly defrauded the public because they overstated revenues by failing to account for invoices they knew would be uncollectible and by failing to keep a sufficient reserve for these uncollectibles. Defendants allegedly made these types of fraudulent statements regarding transactions with non-related companies, particularly Waste Management, Inc. ("WMI"), and related entities. Defendants also allegedly made material omissions by failing to disclose aspects of their transactions with related entities.

Plaintiffs make allegations regarding WMI, Answerthink's largest revenue producing customer during the Class Period. Id. at ¶¶ 82–86. According to an unidentified former employee, Answerthink had "loaded up the [WMI] project with a high number of people who were working at high hourly consulting rates" which Defendants knew would be later renegotiated. Id. at ¶ 83. During the summer of 2001, Answerthink's consulting rate went from $350 an hour to $150 an hour, and the maximum hours consultants could charge went from 60–70 hours a week to 45 hours a week. Id. at ¶¶ 84–85. Yet another former employee stated that even after the hours decreased, Answerthink consultants worked more than the 45 hour maximum, and the remaining hours were placed in an "Unbilled Revenue Account" which was included as revenue even though it was "common knowledge" that Answerthink was never going to realize the revenue. Id. at ¶¶ 85–86. Defendants finally disclosed the material rate concessions it made to WMI in a conference call on February 7, 2002. Id. at ¶ 7. That same day, Defendants issued a press release announcing financial results which, allegedly for the first time, were not materially impacted through the addition of fictitious

revenues. *Id.* In response, Answerthink stock dropped by approximately 15 percent. *Id.*

Defendants also allegedly made material misrepresentations in connection with its related party transactions. According to Plaintiffs, Defendants, through ITP, directed related companies to enter into contracts with Answerthink despite the fact that these companies were financially unable to fulfill the agreements. *Id.* at ¶ 42. Defendants allegedly required related parties [3] to channel business to Answerthink as a condition of funding. *Id.* at ¶ 2. Plaintiffs cite to a number of unidentified former employees who allege that it was "common knowledge" that these related entities would be unable to pay their bills, yet Defendants continued to staff the projects, bill the clients, and report the revenue. *Id.* at ¶¶ 51–79. Through their investments in the related parties, and central role in directing their operations, Defendants learned that these parties had no ability to pay Answerthink for contracted services. *Id.* at 2. Nevertheless, Defendants failed to account for uncollectible receivables from these parties in a timely manner. *Id.* Further, Defendants failed to disclose that earnings were materially impacted by related party transactions and that the reported "record" results included revenues recognized from transactions with related parties who were near-bankruptcy and lacked the financial means to finalize sales. *Id.* at ¶ 1. Plaintiffs state that the full extent of Defendants' related-party transactions were finally disclosed on April 8, 2002. *Id.* at ¶ 8. On that day, Defendants disclosed

that more than six million dollars of uncollectible accounts from these related companies had been carried on Answerthink's books throughout the Class Period, and were not written off until 2001. *Id.*

Plaintiffs allege that several motives induced Defendants to defraud the public: maintaining the value of their stock options, increasing the size of their bonuses, selling their Answerthink shares at inflated prices, and maintaining the image of a "high-growth" company to create the illusion that it was meeting analysts' expectations in order to attract a buyer Complaint ¶¶ 92–94, 97, 98, 99. First, Plaintiffs allege that if Defendants were unable to meet quarterly projections, then consultants (the Company's core asset) would leave. *Id.* at ¶ 90. As a consulting business, Answerthink's revenues were generated by its employees. *Id.* at ¶ 3. A significant portion of its employees' compensation was based on restricted stock options. *Id.* When Answerthink's stock price fell, revenue-generating consultants allegedly left the Company in droves. *Id.* Accordingly, Defendants were under pressure to inflate the Company's stock price. *Id.* Further, Defendants owned huge holdings of restricted stock in the Company and several stock options, motivating them to engage in fraud. *Id.* at ¶¶ 97–99. A majority of their compensation was comprised of restricted stock options which vested during the Class Period. *Id.* at 4. Defendant Miller's stock, for example, was used as collateral for a loan, and when the Company's stock price dropped, Miller was forced to sell $2.57 million worth of his holdings to meet a margin call.[4] *Id.* Plaintiffs also

---

3. The phrase "related parties" is a term of art used to refer to WCOL, eSavio, I–Parts, and VisualPlex collectively, not to Defendants in this action.

4. To support their argument that these allegations plead scienter, Plaintiffs cite *In re Sprint*

*Corp. Sec. Litig.*, 232 F.Supp.2d 1193 (D.Kan. 2002), in which the plaintiffs alleged that the defendants were motivated by $ 1.7 billion worth of stock options, previously unexercisable, which accelerated and vested upon shareholder approval of the merger. *Id.* at 1224. With respect to each individual defendant, the

allege that Defendants improperly inflated revenue in order to find a buyer for the Company. *Id.* at ¶ 93. Finally, Plaintiffs allege that Defendants wanted to sell their Answerthink shares at an inflated price. *Id.* at ¶¶ 95–96.

Plaintiffs state that Answerthink stock traded at over $34 per share at the beginning of the Class period. *Id.* at ¶ 14. Allegedly as a result of Defendants' accounting fraud, it was trading at only $5.90 per share by April 26, 2002. *Id.* The stock has not recovered in May 2003, it was trading at slightly more than $2 per share. *Id.*

## C. False Statements During the Class Period

In support of their claim for securities fraud, Plaintiffs allege that beginning on February 8, 2000, Answerthink made material misrepresentations and omissions in its press releases and its Form 10–K and 10–Q filings with the SEC. Complaint ¶ 1. Plaintiffs state that when reporting its financial results for each quarter beginning in the fourth quarter of 1999 and ending in the third quarter of 2001, Answerthink fraudulently recognized revenue it knew it could not collect, under-reserved for doubtful accounts, and did not report its related party transactions,[5] through which it engaged in fictitious transactions while its officers and directors realized substantial profits.[6]

### (1) Fourth Quarter 1999 and Fiscal Year 1999

On February 8, 2000, Answerthink issued a press release announcing "record" financial results for the fourth quarter and the fiscal year ending December 31, 1999. *Id.* at ¶¶ 100–101. In response, the Company's stock traded at $34.75 per share, down from the $35.50 at which it opened that day.[7] See RJN Exh. A.[8] The Compa-

---

complaint set forth the number of previously unvested and unexercisable shares of common stock options that defendant owned, which then accelerated, vested, and became exercisable upon shareholder approval of a merger. *Id.* With respect to those individual defendants who exercised their options after the merger, the complaint stated the number of options each defendant exercised and the amount of proceeds obtained as a result. *Id.* Regarding those individual defendants who did not immediately exercise their options, the complaint set forth the total value of their options realized after the vote. *Id.* In total, the value of the named defendants' accelerated stock options totaled nearly $ 600 million. *Id.* Plaintiffs allegations in no way set forth the detail of this complaint, as explained in Part V.A.(5), *infra.*

5. Of significance, while the Company did business with related parties through 2000 and 2001, these transactions were disclosed in accordance with SEC rules (RJN Exhs. C at 39, B at 44, G at 9, H at 10–11, J at 9), and, in any event, represented only 16.7 million in 2000 and $2.1 million in 2001 (Complaint ¶ 183) of the Company's $311 million and $247 million, respectively (RJN Exh. B at 18), in revenues during those two years. Based on these numbers, I conclude that the allegations regarding related parties do not sufficiently allege materiality. *See infra* Part V.A(3).

6. The allegations regarding revenue recognition, low reserves, and related party transactions often overlap. Each of these areas will be examined for every quarter of the Class Period to the extent that Plaintiffs alleged them.

Plaintiffs do not make any specific allegations that any individual Defendant actually realized these profits or benefitted from the purported fraud in any way.

7. Defendants stated in Oral Argument that February 2000 was the during the time period when the dot.com industry was doing favorably (Transcript at 26, 33), and the later decline in the stock price correlated to the decline of this industry (*Id.* at 9, 11). Plaintiffs do not address the argument that the stock price fluctuations follow the general stock trends of companies involved in the dot.com industry.

8. Defendants filed several exhibits along with a Request for Judicial Notice (DE # 51) on

ny filed its Form 10–K for fiscal year 1999 with the SEC on March 10, 2000. *Id.* at ¶ 1... It was signed by each Individual Defendant and presented substantially the same information as the press release. *Id.* at ¶ 111. Plaintiffs allege that the press release and SEC filing were materially false and misleading for the reasons set forth below.

### (a) Uncollectible Accounts

Plaintiffs state that the financial results did not take into account bills which Defendants knew would be uncollectible. Plaintiffs state that by the time the press release reporting the results of fiscal year 1999 was issued, the uncollectible accounts had reached a total of $2,837,366.81 [9] (the total invoice amount according to the Aging Report [10]). *Id.* at ¶ 108.

Plaintiffs make several allegations to support their statements that Defendants knew that these accounts would be uncollectible. According to an unidentified former Answerthink director of Customer Relations, Answerthink commonly booked revenue from related entities it knew would not pay its bills. *Id.* at ¶ 105. Plaintiffs allege that Defendants knew quickly when an account would be uncollectible because bills were sent to customers every two weeks and payment was due immediately upon receipt of the invoice. *Id.* at ¶ 109. Finally, Defendants allegedly knew that the Unbilled Revenue Account, *see supra* Part III.B, was uncollectible, yet they allegedly recognized revenue from this account when reporting their financial results. *Id.* at ¶ 116.

Plaintiffs allege that knowingly inflating profits by failing to take uncollectible bills into account violates GAAP, which in turn violates SEC Regulation S–X (requiring financial statements filed with the SEC to conform with GAAP) and Answerthink's own internal accounting policy. *Id.* at ¶ 188. GAAP (FASB Statement No. 5) requires a charge to income of an estimated loss from a loss contingency if it is likely that an asset has been impaired and the amount of the loss can be reasonably estimated. *Id.* at ¶ 106. Plaintiffs allege that Answerthink's Aging Reports as of February 8, 2000 indicated uncollectible receivables exceeding the probability threshold established by GAAP. *Id.* at ¶ 107. The failure to account for these uncollectible receivables allegedly violated GAAP and Answerthink's internal accounting policy, which included flagging bills outstanding for 20 days. *Id.* at ¶¶ 108–109, 115.

### (b) Low Reserves

Plaintiffs' allegations that Defendants recognized revenue on uncollectible accounts are closely linked to the allegations regarding insufficient reserves. Plaintiffs state that Defendants inflated revenue by failing to establish a large enough reserve to cover bad debt. Plaintiffs allege that although uncollectible accounts totaled $2,837,366.81, or 1.09 percent of the Company's total net revenue, the 1999 year end financial statements reflected a reserve of

---

July 15, 2003. For the reasons set forth in Part IV, *infra,* the Court judicially notices the exhibits that are publicly-filed documents or are incorporated by reference in the Complaint. The Court will refer to the exhibits as "RJN Exh." followed by the exhibit letter.

**9.** This number represents only 1.09 percent of the net revenue reported for fiscal year 1999,

which was approximately $260,460,000. *See* RJN Exh. B. at 18.

**10.** The term "Aging Report" refers to a summary spreadsheet of the Company's "Accounts Receivable Report." *Id.* at ¶ 36.

only $1,510,000. *Id.* at ¶ 110; *see* RJN Exh. B at 18.

### (c) Related Party Transactions

Answerthink failed to disclose the following regarding its related party transactions: (1) that WCOL was a related entity, (2) that at least $2.1 million[11] of the reported revenue was from transactions with related entities, including this company (revenue from WCOL alone was allegedly $1,746,000), (3) $644,000, including $108,018.76 from WCOL, was owed to the Company by related entities, and (4) the WCOL transaction did not provide for payment in cash. *Id.* at ¶¶ 104, 115. These latter two omissions allegedly violated GAAP (FASB Statement No. 57), which requires certain disclosures regarding related entity transactions. *Id.* at ¶ 115.

### (2) False Statements During the First Quarter of 2000

On April 13, 2000, a newspaper published an article including statements made by Fernandez. *Id.* at ¶ 157. Five days later, Answerthink issued a press release announcing "record" financial results for the first fiscal quarter ending March 31, 2000. *Id.* at ¶ 117. On May 15, 2000, the Company filed a Form 10–Q for the fiscal quarter with the SEC. *Id.* at ¶ 124. Brennan signed the document, which reflected substantially the same information as the April 18, 2000 press release. *Id.* at ¶ 124. Plaintiffs allege that these reports contained fraudulent representations regarding (a) uncollectible accounts, (b) the Company's reserve, and (c) related entity transactions. During this quarter, Answerthink also filed a Form DEF 14A with the SEC, which Plaintiffs allege failed to disclose the Company's related entity transactions. *Id.* at ¶ 122.

### (a) Uncollectible Accounts

In the April 13, 2000 article, Fernandez stated that Answerthink would not work with a company that did not have the resources to pay its bills. *Id.* at ¶ 157. Former Answerthink employees, however, state that Fernandez knew that WCOL accounts were uncollectible. *Id.* at ¶ 158. Thus, Plaintiffs maintain that Defendants improperly recognized revenue and lied to the public by continuing to record uncollectible accounts as income.

### (b) Low Reserves

Plaintiffs allege that the first quarter reports materially understated the uncollectible reserves. The total invoice amount on the Aging Report amounted to $2,837,366.81, but the reserve was only $1,384,000 as of the date of the press release. *Id.* at ¶ 120.

### (c) Related Party Transactions

Further, the press release failed to disclose the amount of revenue derived through related party transactions, which Plaintiffs allege was $795,062.37 based on the Company's Aging and "FreshPlex Financial Recap"[12] Reports. *Id.* at ¶ 121. The Form 10–Q failed to disclose that WCOL and I–Parts were related parties, the amount of revenue from these parties, and that the parties were not going to pay Answerthink in cash. *Id.* at ¶ 125.

The Company's Form DEF 14A, filed with the SEC on April 19, 2000, falsely purported to disclose each of the Company's related entity transactions. *Id.* at ¶ 122. The form, in violation of GAAP

---

11. This amount represents only 0.81% of Answerthink's revenue for fiscal year 1999. *See* RJN Exh. B at 18.

12. FreshPlex was one of Answerthink's WCOL projects during the Class Period.

(FASB Statement No. 57), withheld the fact that WCOL was a related entity and that the Company received revenues of $1,746,000 and $795,062.37 from WCOL in 1999 and the first quarter of 2000, respectively. *Id.* at ¶ 123.

### (3) Second Quarter of 2000

Plaintiffs make similar allegations of false statements during the second quarter of 2000. Plaintiffs state that Answerthink's second quarter results (a) reported reserves which, based on the uncollectible accounts, were too low and (b) failed to disclose third party transactions.

#### (a) Low Reserves

Plaintiffs allege that a July 17, 2000 press release falsely stated that Answerthink made progress collecting receivables. *Id.* at ¶ 126–127. The reserve for doubtful accounts, however, was $1,755,000 while the uncollectible receivables amount allegedly indicated by the Aging Report was $2,837,366.81. *Id.* at ¶ 127.

#### (b) Related Party Transactions

The press release allegedly failed to disclose revenue derived through related party transactions. *Id.* at ¶ 128. The Form 10–Q for the fiscal quarter end, signed by Brennan and filed with the SEC on June 30, 2000, also failed to disclose the existence of related parties, the revenue derived from these parties, and the transactions that were not to be paid for in cash. *Id.* at ¶¶ 129–131.

### (4) Third Quarter 2000

The Company issued a press release announcing third quarter results on October 7, 2000 and filed a Form 10–Q on November 13, 2000 for the fiscal quarter signed by Brennan. *Id.* at ¶¶ 132, 138. These reports allegedly withheld material information regarding (a) uncollectible accounts and the low reserve and (b) related party transactions.

#### (a) High Uncollectible Accounts and Low Reserve

The reserve reported in the third quarter 2000 financials were allegedly too low to account for uncollectible receivables. According to Plaintiffs, an Aging Report indicates that by September 30, 2000, uncollectible receivables increased by $1,507,090.39, for a total of $4,344,457.20. *Id.* at ¶ 134. The reserve as of this date, however, was only $2,713,000.[13] *Id.* at ¶ 135.

#### (b) Related Parties

Answerthink allegedly failed to disclose the existence of related parties and the revenue derived from these parties in its third quarter 2000 results. *Id.* at ¶¶ 136–139. The Form 10–Q allegedly violated GAAP's disclosure provisions by reporting revenues from related party transactions, including $1.5 million for a transaction with eSavio. *Id.* at ¶¶ 138–139. Plaintiffs claim that the eSavio transaction, the sale of a license for a proprietary knowledge management system, was "contrived" because it was with a related party. *Id.* at ¶ 138.

### (5) Fourth Quarter 2000 and Fiscal Year 2000

During the fourth quarter of 2000, on December 19, 2000, Answerthink issued a press release stating that it had increased its reserve for dot.com receivables in order to reduce its exposure from these clients.

---

13. By the end of the fiscal year, Answerthink's net revenue was $311,136,000, so the alleged uncollectible receivables represented only 1.40 percent of the total revenue. *See* RJN Exh. B at 18.

*Id.* at ¶ 140. Answerthink issued another press release on February 13, 2001 announcing financial results for the fourth quarter of 2000 and for the fiscal year. *Id.* at ¶ 144. On March 29, 2001, Answerthink filed its Form 10–K for the fiscal year ending December 29, 2000. *Id.* at ¶ 152. Defendants Brennan, Fernandez, Frank, Kessinger, and Rauner signed the document. *Id.* at ¶ 152. Plaintiffs allege that Defendants continued to make fraudulent statements and omissions regarding uncollectible accounts, reserves, and related party transactions during this quarter.

### (a) Uncollectible Accounts and Low Reserve

Plaintiffs state that by this date, Defendants had "identified" $9,419,392.07 [14] in uncollectible receivables.[15] *Id.* at ¶ 145. Plaintiffs allege that the reported fourth quarter and fiscal year income were overstated because the reserve was much lower than this amount. *Id.* at ¶ 147. According to Plaintiffs, the press release regarding an increased reserve was an attempt to use the decline of the dot.com industry as a scapegoat for its belated adjustments to its reserve, which was allegedly still insufficient. *Id.* at ¶ 141.

Plaintiffs allege that analyst reports show that the market had accepted Defendants' fraudulent representations. A December 20, 2000 analyst report stated that Answerthink was experiencing a short-term problem and that the Company "now has a clean slate." *Id.* at ¶¶ 142–143, 149. A February 14, 2001 analyst report stated that "the quality of receivables should improve going forward with the write-off in the quarter." *Id.* Plaintiffs state that these reports prove that the market had

been falsely reassured that all uncollectible accounts had been resolved. *Id.* at ¶ 149.

### (b) Related Party Transactions

The February 13, 2001 press release also failed to disclose related party transactions with WCOL and eSavio. *Id.* at ¶ 148. Plaintiffs allege that the Form 10–K failed to disclose related party uncollectible receivables in compliance with GAAP (FASB No. 5). *Id.* at ¶ 154.

### (6) First Quarter 2001

On March 12, 2001, Answerthink issued a press release quoting Fernandez and touting the WMI contract. *Id.* at ¶ 150. On April 24, 2001, the Company issued another press release, this time announcing financial results for the first quarter ending March 30, 2001. *Id.* at ¶ 159. On May 14, 2001, Answerthink filed a form 10–Q for the fiscal quarter ending March 30, 2001 signed by Brennan. *Id.* at ¶ 163. According to Plaintiffs, these reports (a) overstated revenue by not accounting for unbillable accounts and (b) inadequately disclosed related party transactions.

### (a) Unbillable Accounts

Fernandez was quoted in the March 12, 2001 news article regarding the success of the WMI contract. *Id.* at ¶ 150. Plaintiffs argue that by speaking about the WMI contract at all, Fernandez was obligated to disclose the full truth about the project, including its "overbilling," renegotiating the billing rate and the hours worked, and the Unbilled Revenue Account. *Id.* at ¶ 151. The May 14, 2001 press release and the Form 10–Q also overstated income by improperly accounting for uncollectible receivables. *Id.* at ¶ 162.

---

**14.** This amount reflects 3.08% of Answerthink's net revenue of $311,136,000 for the year. *See* RJN Exh. B at 18.

**15.** Plaintiffs base this allegation on what appears to be an Aging Report. *Id.* at ¶ 145.

#### (b) Related Party Transactions

Plaintiffs allege that the April 24, 2001 press release materially inflated Answerthink's earnings because it included fictitious revenue from related parties that Defendants knew did not have the ability to pay. *Id.* at ¶ 160. A former Answerthink Electronic Commerce Practice employee states that Brennan and Fernandez ultimately made the decision whether to recognize revenue. *Id.* at ¶ 160. Plaintiffs allege that recognizing this revenue violates GAAP, Statement of Financial Accounting Concepts No. 5, paragraph 83, which states that revenue should ordinarily be accounted for at the time a transaction is completed and that revenues and gains are not recognized until realized or realizable. *Id.* at ¶ 161. The Form 10–Q also allegedly failed to disclose related party transaction revenue, in violation of GAAP. *Id.* at ¶ 162, 164–165.

#### (7) Second Quarter of 2001

The Company issued a press release and filed a Form 10–Q, signed by Brennan for the second quarter of 200. *Id.* at ¶¶ 167–168. The reports overstated income by improperly accounting for uncollectible receivables and by failing to disclose related party transaction revenue, the latter in violation of GAAP. *Id.* at ¶ 169.

#### (8) Third Quarter 2001

An analyst report regarding a meeting with Answerthink management, including Brennan, was published on August 30, 2001. *Id.* at ¶ 170. The report and a press release issued at this time stated that Answerthink management believed that the WMI contract was progressing well, and that management thought the work would continue at the same rate in terms of the hours worked and the amount billed. *Id.* at ¶¶ 170, 174. Plaintiffs allege that these reports and the Company's Form 10–Q for the third quarter of 2001 fraudulently overstated revenue by failing to account for uncollectible receivables and failing to report a related party's default on payment. Plaintiffs allege that Answerthink management's statements regarding WMI were false because rates in the WMI Contract had to be renegotiated. *Id.* at ¶¶ 171, 175. Plaintiffs state that the press release and 10–Q for this period overstated net revenue by failing to account for uncollectible receivables and other worthless assets in compliance with GAAP. *Id.* at ¶ 177. The reports also allegedly failed to disclose that eSavio had defaulted on its $1.5 million license fee payment obligation. *Id.* at ¶ 178.

#### (9) Fourth Quarter 2001

Answerthink filed its Form 10–K for the year ending December 28, 2001, signed by Brennan, Fernandez, and Frank on March 28, 2002. *Id.* at ¶ 183. It allegedly overstated revenue by failing to disclose the price concessions on the WMI contract. *Id.* at ¶ 183.5.[16] This omission allegedly violates SEC Financial Reporting Release No. 36, which provides that the management's discussion and analysis section of a company's financial statements should "give investors an opportunity to look at the registrant through the eyes of management" by providing information regarding "a registrant's prospects for the future." *Id.* at ¶ 183.5.

#### D. Events Signaling Close of Class Period

Plaintiffs allege that Defendants' fraud was revealed during the fourth quarter of 2001. An analyst report on February 7,

---

**16.** In the Complaint, Plaintiffs number the paragraph between 183 and 184 as 88. Because there is already a paragraph 88, the Court will refer to the second one as 183.5.

2002 disclosed that there had been a "run rate decline" in terms of the hours and amount billed with respect to the WMI contract. *Id.* at ¶ 181. On the same day, a press release for this period reported that Answerthink's net revenues had decreased. *Id.* at ¶ 180. Unlike the previous year's fourth quarter results, these results did not overstate revenue, and accordingly, the price of the Company's stock dropped 15% in heavy trading. *Id.* at ¶ 182. On February 7, 2002, the Answerthink stock opened at $6.77 and closed at $6.01.[17] RJN Exh. A.

In addition, in an April 8, 2002 Form DEF 14A, Defendants disclosed their related party transactions. Between April 8 and April 26, Answerthink stock dropped from more than $7 to $5.90 per share. *Id.* at ¶ 187.

Finally, during a conference call on April 25, 2002, Defendants disclosed that margins had suffered because of rate concessions to WMI. *Id.* at ¶ 185. This information was not disclosed in the 2001 Form 10–K filed on March 28, 2002 in violation of Item 303 of Regulation S–K under the Exchange Act. *Id.* at ¶ 185. Item 303 makes it a duty to disclose "known trends or any known demands, commitments, events or uncertainties" that are reasonably likely to have a material impact on a company's sales, income or liquidity, or cause previously reported financial information not to be indicative of future operating results. *Id.* at ¶ 185.

Plaintiffs allege that as a result of the revealed fraud, Answerthink stock was trading at $2 per share when the Complaint was filed, down from its Class Period high of $34.75 per share on February 8, 2000. *Id.* at ¶ 187.

## IV. Motion to Dismiss Standard [18]

To warrant dismissal of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, it must be "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Rendon v. Valleycrest Prods.*, 294 F.3d 1279, 1282 (11th Cir.2002) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)), *reh'g denied*, 54 Fed. Appx. 493 (11th Cir.2002). Determining the propriety of granting a motion to dismiss requires courts to accept all the factual allegations in the complaint as true and to evaluate all inferences derived from those facts in the light most favorable to the plaintiff. *See In re Villa*, 261 F.3d 1148, 1150 (11th Cir.2001) (citation omitted), *cert. denied*, 535 U.S. 1112, 122 S.Ct. 2328, 153 L.Ed.2d 159 (2002). "[U]nless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," the complaint should not be dismissed on grounds that it fails to state a claim upon which relief can be granted. *Beck v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir.1998) (citation omitted), *reh'g denied*, 189 F.3d 487 (11th Cir.1999). Nevertheless, "to survive a motion to dismiss, [a] plaintiff must do more than merely label his claims." *Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.*, 208 F.Supp.2d 1310, 1313 (S.D.Fla.2002) (citation omitted). More-

---

17. The day the previous year's fiscal results were announced in a press release (February 13, 2001), allegedly during the period when Answerthink was still making misrepresentations, the stock price closed at $6.03. *See* RJN Exh. A.

18. In reciting the applicable standards and analyzing the Motions to Dismiss, I have relied extensively on my other opinion in *Cheney v. Cyberguard* and Judge Donald M. Middlebrooks' opinion in *In re Sunbeam Securities Litigation*, 89 F.Supp.2d 1326 (S.D.Fla.1999).

over, when on the basis of a dispositive issue of law no construction of the factual allegations will support the cause of action, dismissal of the complaint is appropriate. *Id.* (*citing Marshall County Bd. of Educ. v. Marshall County Gas*, 992 F.2d 1171 (11th Cir.1993) ).

In this case, Defendants requested that judicial notice be taken of documents referenced in the Complaint and documents required to be filed with the SEC (DE # 51 filed July 15, 2003). Plaintiffs have filed no objection During Oral Argument, Plaintiffs acknowledged that under *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir.1999), judicial notice can be taken of certain documents when deciding a motion to dismiss in a securities fraud case. Transcript at 5.

■ In *Bryant*, the Eleventh Circuit held that a district court is authorized at the motion to dismiss stage to take judicial notice of relevant public documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC. 187 F.3d at 1280. Thus, since *Bryant*, district courts have taken judicial notice of publicly filed documents in securities fraud cases upon a motion to dismiss. *See, e.g., In re Unicapital Corp. Sec. Litig.*, 149 F.Supp.2d 1353, 1358 (S.D.Fla.2001) ("in securities litigation, it is appropriate to take judicial notice of publicly filed documents at the motion to dismiss stage' ") (*citing Bryant*, 187 F.3d at 1275–1281); *Cheney*, 2000 WL 1140306 at *13 (*citing Malin v. Ivax Corp.*, 17 F.Supp.2d 1345, 1352 (S.D.Fla.1998) (stating that documents required to be filed with the SEC and actually filed are appropriate for judicial notice, therefore may be considered in evaluating a motion to dismiss)). Further, "[i]n determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders,

items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *In re Med/Waste, Inc. Sec. Litig.*, Civ. No. 99–1684, 2000 U.S. Dist. LEXIS 22505, at *12–*13 (S.D.Fla. Aug. 30, 2000). Thus, I shall consider the facts alleged in the complaint, those documents attached to or incorporated into the complaint, and matters that can be judicially noticed, including the SEC filings Defendants submitted in support of their Motion.

## V. Standard for Pleading Violations of Section 10(b) and 20(a)

### A. Sections 10(b) and 20(a) Requirements

■ In the Complaint, Plaintiffs argue that defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) ("Section 10(b)"), and 17 C.F.R. § 240.10b–5 ("Rule 10b–5"), by failing to disclose material facts and making false statements regarding the financial status of Answerthink. Section 10(b) makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 prohibits the making of any untrue statement of material fact or the omission of a material fact that would render statements made misleading in connection with the purchase or sale of any security. See 17 C.F.R § 240.10b–5. To successfully state a securities fraud claim under Rule 10b–5, a plaintiff must show the following: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the plaintiff's injury. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 (11th Cir.1999).

## B. Federal Rule of Civil Procedure 9(b)

██ In order to survive the Motion to Dismiss, Plaintiffs' claim of fraud under Rule 10b–5 must also satisfy the requirements of Federal Rule of Civil Procedure 9(b), which requires that the "circumstances constituting fraud ... be stated with particularity." *See, e.g., Gross v. Medaphis Corp.,* 977 F.Supp. 1463, 1470 (N.D.Ga.1997). The Rule 9(b) standard assures fair notice to the defendants of the nature of the federal securities claims and the grounds for the claims, such that defendants have adequate information to frame a response. *See Harvey M. Jasper Retirement Trust v. Ivax Corp.,* 920 F.Supp. 1260, 1265 (S.D.Fla.1995). The Rule will be satisfied if the complaint sets forth what statements or omissions were made in what documents or oral representation; the time and place of the statements or omissions; who made the statements; the content of the statement and the manner in which they misled the plaintiffs; and what the defendant "obtained as a consequence of the fraud." *Brooks v. Blue Cross and Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1369 (11th Cir.), *reh'g denied,* 116 F.3d 1495 (11th Cir.1997).

## C. Heightened Pleading Requirements under the Reform Act

Furthermore, the Private Securities Litigation Reform Act of 1995, Pub.L. No. 194–67, 109 Stat. 743, codified at 15 U.S.C. § 78u–4(b) ("Reform Act" or "PSLRA"), establishes heightened pleadings requirements for certain private securities actions. If these additional requirements are not met, the district court must dismiss the action. 15 U.S.C. § 78u–4(b)(3). Section 78u–4(b) imposes two requirements. First, the plaintiff must specify each statement alleged to have been misleading and the specific reason or reasons why such statement is misleading. 15 U.S.C. § 78u–4(b)(1).[19] This provision requires pleading with particularity all facts upon which the plaintiff is basing the fraud allegation, and thus is even more specific than the Rule 9(b) standard. *Malin,* 17 F.Supp.2d at 1361

Second, the would-be plaintiff, for each alleged misrepresentation, must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Section 78u–4(b)(2), Required State of Mind, provides the following:

> In any private action arising under this title in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to have violated this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

## VI. Analysis

Applying these well-established legal principles to Plaintiff's allegations, grant Defendants' Motion to Dismiss the Com-

---

19. Section 78u–4(b)(1) states the following:

In any private action arising under this title in which the plaintiff alleges that the defendant—(A) made an untrue statement of a material fact; or (B) omitted to state a material fact in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

plaint without prejudice.[20] In explaining my conclusion, will focus on the issue of scienter because it is determinative in this case. Further, scienter is intertwined with other elements of a 10b–5 claim. Accordingly, will address the first two elements of a securities fraud claim, (1) a misstatement or omission (2) of a material fact, in the context of scienter, where applicable. After discussing scienter, will briefly discuss the fifth element of a securities fraud claim, causation, because Defendants argue that Plaintiffs have failed to allege this element.

## A. Scienter

 Defendants argue for dismissal because Plaintiffs have failed to sufficiently allege that Defendants acted with "severe recklessness" concerning the alleged fraud involving sufficient reserves for uncollectible accounts. While the group pleading

doctrine may assist Plaintiffs in satisfying the Reform Act's and Rule 9(b)'s particularity requirements, it does not apply to the Reform Act's scienter requirement. *Sunbeam Sec. Litig.*, 89 F.Supp.2d 1326, 1341 (S.D.Fla.1999).[21] "The Reform Act requires that a complaint (1) state with particularity facts (2) giving rise to a strong inference (3) that each separate defendant acted with scienter (4) with respect to each act or omission alleged." *Id.* (*citing* 15 U.S.C. Section 78u–4(b)(2)). The scienter of a corporation's officer may be imputed to the corporation itself under general agency and corporate law principles.[22] *Cheney v. Cyberguard Corp.*, 2000 WL 1140306, at *7 (S.D.Fla.2000).

 The Eleventh Circuit has held that scienter is satisfied by a showing of "severe recklessness." *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814

---

**20.** In their Motion to Dismiss, Defendants seek dismissal with prejudice, yet they do not cite any case law allowing for such a result. During oral argument, Defendants conceded that in the Eleventh Circuit, when dismissing a first complaint, the standard is to dismiss without prejudice in order to give a plaintiff the chance to amend the complaint to state a claim. Transcript at 6. They continued, however, that the Complaint cannot be remedied to state a claim, and thus dismissal with prejudice is appropriate. *Id.*

Eleventh Circuit case law regarding when a district court should dismiss a complaint with prejudice has recently changed. Under the old rule, district courts were required to dismiss complaints without prejudice when it appeared that a more carefully drafted complaint might state a claim upon which relief could be granted. *Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir.1991), *overruled by Wagner v. Daewoo Heavy Indus. America Corp.*, 314 F.3d 541, 542 (11th Cir.2002). This rule applied even where the plaintiff never sought leave to amend. *Id.* Under the new rule, however, "[a] district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to

amend nor requested leave to amend before the district court." *Wagner v. Daewoo Heavy Indus. America Corp.*, 314 F.3d 541, 542 (11th Cir.2002). Plaintiffs have not requested leave to amend the Consolidated Amended Complaint. Accordingly, I am not required to dismiss the Complaint without prejudice. I will do so, however, and give Plaintiffs the opportunity to amend their Complaint in accordance with this Order.

**21.** In *Sunbeam*, the district court explained, "Under the group pleading doctrine, allegations of securities fraud based upon statements in group published information are presumed to be the collective action of corporate officers involved in the day-to-day management of the corporation." 89 F.Supp.2d at 1340.

**22.** While Plaintiffs attribute all of the allegedly false or misleading statements during the Class Period to all the Defendants, the Complaint fails to allege any particularized facts which connect Messrs. Kessinger, Miller or Rauner, the Company's outside directors, to these misstatements. Instead, Plaintiffs attempt to rely on the "group pleading doctrine." Complaint ¶ 23. This, however, is not sufficient to establish scienter.

(11th Cir.1989). It defines severe recklessness as the following:

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that presents a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*McDonald,* 863 F.2d at 814 (citations omitted). Subsequently, in *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271 (11th Cir. 1999), the Eleventh Circuit reaffirmed the applicability of the "severe recklessness" standard after the enactment of the Reform Act, holding that a "complaint alleging with particularity that a defendant acted with a severely reckless state of mind still suffices to state a claim for civil liability under Section 10(b) and Rule 10b–5" *Bryant,* 187 F.3d at 1283. This means that the Plaintiffs must allege specific facts showing that each Defendant acted with severe recklessness. *Bryant,* 187 F.3d at 1287. In my view, Plaintiffs have failed to meet this important burden.

■ Plaintiffs' Consolidated Amended Complaint alleges in essence that Answerthink fraudulently recognized revenue it knew it could not collect, under-reserved for doubtful accounts, and engaged in fictitious transactions with related-parties while its officers and directors realized substantial profits. The problem with Plaintiffs' Consolidated Amended Complaint is that it alleges facts insufficient to raise the strong inference of severe recklessness required to allege a claim for securities fraud.

In this case, there is a significant lack of indicia of fraud, which, in turn, refutes any inference that *each* Defendant acted with the requisite intent to deceive. The lack of relevant facts include (1) no suspicious or unusual trading of stock,[23] (2) no particularized allegations of profits by virtue of dealing through related companies or exercising stock options,[24] (3) no restatements or auditor resignations,[25] (4) no allegations

---

**23.** *See, e.g., In re Smith Gardner Sec. Litig.,* 214 F.Supp.2d 1291, 1302 (S.D.Fla.2002) (stating that allegations of insider trading were not suspicious in timing and therefore not probative of scienter); *Cheney,* 2000 WL 1140306. In *Cheney,* this Court denied a motion to dismiss a securities class action against two defendants and granted the motion as to the remaining defendants. *Id.* Plaintiffs alleged that each time one of the individual defendants had sold his stock, it was within days or weeks after the defendant company announced improved or record results. *Id.* Further, they alleged that the individual defendant reduced his substantial ownership interest to zero prior to the announcement of the defendants' accounting fraud. *Id.* These allegations, however, were insufficient to allege scienter because they did not show how the trading was unusual or suspicious in amount. *Id.* at *8 (citation omitted); *see infra* Part V.A.(5) for a further discussion of insider trading.

**24.** In *In re Med/Waste, Inc.,* 2000 U.S. Dist. LEXIS 22505, plaintiffs failed to make any allegations that the defendants seeking dismissal benefitted personally from the alleged fraud or sold any stock while the stock was artificially inflated. *Id.* at *30. In *Cheney,* the action was dismissed as to certain defendants partly because there were no allegations that these defendants actually benefitted from the fraud or took advantage of inflated stock prices to sell their own stock. *Cheney,* 2000 WL 1140306, at *9.

**25.** *Cf. Cheney,* 2000 WL 1140306. In *Cheney,* the defendant company's independent auditors resigned due to an "inability to rely on management's representations" and another company was hired to do a restatement. *Id.* at *2. The sheer magnitude of the restatement was one of the factors leading the Court to conclude that dismissal was inappropriate. *Id.* at *6; *cf. In re Hamilton Bankcorp, Inc. Sec. Litig.,* 194 F.Supp.2d 1353, 1359 (denying dismissal partly because of the "number

that Answerthink and the individual Defendants were confronted directly with any ongoing accounting fraud based upon alleged improper revenue recognition policies,[26] (5) no allegations establishing scienter by virtue of "red flags" such as a management shakeup or indictment or government investigation that were known to and/or severely disregarded by the Defendants' auditors,[27] and (6) no significant price decline following the disclosures at issue.[28] While each criteria is not essential in every case to allege scienter, their absence, without more, strongly supports a lack of indicia of fraud.[29] At best, some of Plaintiffs allegations may rise to the level of poor business judgment or even mismanagement, but do not to the level of fraud. Without doubt, Plaintiffs have endeavored to alleged sufficient facts to withstand a motion to dismiss. In this regard, the Consolidated Amended Compliant contains 207 paragraphs and 99 pages The

of restatements" that had taken place); *In re Sunbeam Sec. Litig.*, 89 F.Supp.2d 1326, 1332 (S.D.Fla.1999) (denying dismissal in part where the restatement resulted in $100 million difference from a pre-tax charge amount represented in the company's Form 10–K during the class period); *In re Homestore.com, Inc. Sec. Litig.*, 252 F.Supp.2d 1018 (C.D.Cal. 2003) (concluding that the restatement of a total of $193 million in revenue, constituting 52.8% of all advertising revenue and 22.8% of total revenue for that time period constituted more than gross negligence); *In re Lernout & Hauspie Sec. Litig.*, 208 F.Supp.2d 74, 88 (D.Mass.2002) (stating that GAAP violations combined with the magnitude of the overstatement of revenue ($189 million in defendant company's revenues) provided strong indications of scienter).

26. *See, e.g., Ziemba v. Cascade Int'l., Inc.*, 256 F.3d 1194, 1210 (11th Cir.2001) ("Plaintiffs have pointed to no "tips," letters, or conversations raising inferences that [the defendant] knew of any fraud. Furthermore, [p]laintiffs have pointed to no facts suggesting that [the defendant] was severely reckless in not knowing about any fraud"); *In re Med/Waste, Inc.*, 2000 U.S. Dist. LEXIS 22505, at *24 (granting dismissal because the plaintiffs failed to alleged that the defendants knew that statements were false when made); *cf. In re Sunbeam Sec. Litig.*, 89 F.Supp.2d 1326, 1338 (S.D.Fla.1999) (denying dismissal where complaint alleged that defendants were directly confronted by employees and financial media about improper accounting); *Hamilton*, 194 F.Supp.2d at 1358 (denying dismissal where allegations included that the fraud was brought to management's attention).

27. The fact that the auditors gave a "clean opinion" at the year end of 2000 raises an inference that Answerthink was properly reserving for bad debt and that the reserves were appropriate at year end. *See* RJN Exh. C at 19.

*Cf. Hamilton*, 194 F.Supp.2d at 1359 (denying dismissal where the Office of Comptroller Currency had conducted a investigation and issued a report of examination and consent order recognizing the lack of internal controls in nineteen problem areas); *In re Lernout & Hauspie Sec. Litig.*, 208 F.Supp.2d at 82 (denying dismissal of complaint including allegations that defendants were arrested in Belgium and charged with forgery and stock manipulation).

28. *See infra* Part V.B; *see, e.g., Sunbeam*, 89 F.Supp.2d at 1332 (denying dismissal in part where common stock price dropped from a class period high of $52 per share to $10 7/16 after disclosures where made).

29. This is particularly the situation where, without dispute, in the middle of Plaintiffs' Class Period, Answerthink significantly increased its reserves for outstanding receivables in a manner which did not raise "red flags" for its auditors in their contemporaneous reports filed with the Security and Exchange Commission. *See* RJN Exh. C at 19. Also, even with the increase in reserves, the stock quickly rebounded. Prior to the Company's press release on December 19, 2000, announcing, among other things, an increase in its reserves for bad debts, the stock price was $4.44. *See* RJN Exh. A. Following the press release, the stock traded between $2.98 (on December 20, 2000) and $9.99 (on June 29, 2001) throughout the remainder of the Class Period, closing at $5.97 on April 25, 2002, the last day of the Class Period. *Id.*

mere magnitude of a Complaint alone, however, does not assure that the heightened pleading requirements under the Reform Act have been met. In discussing how the allegations fall short of establishing scienter, will examine the categories Plaintiffs focused on in the Complaint: (1) improper revenue recognition, (2) failure to establish sufficient reserves, (3) failure to disclose related-party transactions, (4) claims supported by the Aging Reports, FreshPlex Report, and confidential witnesses, and (5) allegations regarding Defendants' motives opportunities, including insider trading. Each category is discussed separately below.

*(1) Fraud Claims Regarding Improper Revenue Recognition in Relation to eSavio, WCOL, and WMI*

To establish false statements and support their claims of scienter, Plaintiffs' Complaint focuses on allegedly improper revenue related to eSavio, WCOL, and WMI. As to these companies, Plaintiffs' theory of fraud rests on the investments certain Answerthink Defendants had in ITP. Plaintiffs' Opposition Brief at 3–7. Miller partially owned Miller Technology Management, L.P., which was the general partner of ITP. *Id.* Because Miller was an outside director on Answerthink's Board of Directors, the companies eSavio, WCOL, I–Parts and VisualPlex were deemed related to Answerthink. *Id.*

### (a) eSavio's Revenue Recognition

Plaintiffs argue that Answerthink improperly recognized revenue in the third quarter of 2000 based upon a sale of a licence to eSavio. Opposition at 11. Even though Plaintiffs concede that Answerthink was paid in full in 2001, they assert that revenue recognition in 2000 was improper because "at the time, looking forward, Defendants had no reasonable basis to believe that eSavio ever would make

such payment." Opposition at 16. Plaintiffs' Complaint, however, fails to allege particularized facts that support this theory. Complaint cites Paragraphs 48, 59, 72 and 86 in regard to the eSavio claim. Paragraphs 59 and 86 do not mention eSavio. Paragraph 72 merely asserts the conclusion that "defendants knew or were reckless in disregarding the fact that eSavio failed to pay Answerthink [the license fee in 2000]." Defendants point out, however, that eSavio was to pay the license fee in accordance with a payment schedule set forth in the license agreement, which itself was disclosed in its Form 10–Q for the quarter ended September 29, 2000 (RJN Exhs. G at 9; H at 10) and the Alliance Agreement in its 2000 and 2001 Definitive Proxy Statements (RJN Exhs. G at 9; H at 10).

### (b) WCOL Revenue Recognition

Plaintiffs argue that Defendants improperly recognized revenue from WCOL because (1) WCOL's non-cash consideration was worthless at the time Answerthink booked its revenue; (2) WCOL was no longer able to pay for its services "during 2000, especially the second half of 2000"; and (3) WCOL's "delinquent receivables" should have been "written off accordingly." Opposition at 15. The Complaint, however, fails to include facts sufficient to establish these claims.

First, the Complaint fails to identify any facts that establish that the warrants were worthless at the time revenue was recognized. The first reference in the Complaint to financial troubles at WCOL is August 2000, well after the warrants were issued and valued in March 2000. Complaint ¶¶ 52 and 63. Furthermore, there are no allegations that the value assigned to the warrants was questioned by the Company's auditors, or that Answerthink had to restate its financial results as relat-

ed to these warrants. As Defendants point out, the Company's auditors issued an unqualified opinion on the Company's financials. RJN Exh. C at 19.

Second, there is nothing sufficiently alleged suggesting that WCOL would not continue to pay its bills at the time the Company received the warrants in March 2000. While WCOL's accounts receivables continued to increase during 2000, WCOL also made payments in the amount of $5,934,000 during that year. *See* RJN, Ex. H at 11. While Plaintiffs claim that WCOL's status as a publicly traded company and its market capitalization do not offer any indication of its ability to pay bills (Opposition at 13), the fact that a company is incurring a loss, running out of money, or even near-bankrupt, "does not mean that it necessarily [lacks the] ability to generate revenues or make future payments to its creditors from such revenues." *In re Smith Gardner Sec. Litig.*, 214 F.Supp.2d 1291 1303 (S.D.Fla.2002) (concluding that "[m]ere allegations that Defendants held senior management positions, had access to inside information, and therefore must have known of the falsity of certain statements is insufficient to plead scienter"); *see also In re Sunterra Corp. Sec. Litig.*, 199 F.Supp.2d 1308, 1324 (M.D.Fla.2002) (holding that allegations that defendants "must have known" that receivables would turn out to be uncollectible because of high positions in the company did "not pass muster under the PSLRA."). Also, unlike the cases cited by Plaintiffs in support of their position, there are no allegations here of a restatement of earnings, transactions that were not approved by the Company's independent au-

ditors, or executives who were subject to criminal investigation and prosecution, or direct benefit by the officers and directors from the fraud.[30] Plaintiffs' Opposition at 12 (*citing In re Homestore.com, Inc. Sec. Litig.*, 252 F.Supp.2d 1018, 1024–1025 (C.D.Cal.2003); *In re Northpoint Communications Group Inc. Sec. Litig.*, 221 F.Supp.2d 1090; *In re Lernout & Hauspie Sec. Litig.*, 208 F.Supp.2d 74 (D.Mass. 2002)).

### (c) WMI's Revenue Recognition

 Plaintiffs allege that Defendants' statements regarding the WMI contract were fraudulent because the contract was renegotiated and because Defendants employed several employees on the project. Complaint at ¶¶ 116, 151, 171, 175, 183.5, and 185. Plaintiffs further allege that the March 10, 2000, Annual Report, the March 12, 2001, press release, and the 2001 10–K filed on March 28, 2002 failed to disclose that the Company had improperly recognized revenues due to a rate concession it had granted to WMI. Complaint ¶¶ 116, 150, 183. According to Plaintiffs, Answerthink improperly booked as revenue the accounts it would have billed to WMI at a higher rate, had it not been "forced" to renegotiate the WMI contract. Complaint ¶ 151 Plaintiffs allege that the renegotiation occurred sometime "during the summer of 2001," and the rate concessions "decrease[d] [Answerthink's] margins during the first quarter of fiscal 2002." (Complaint ¶¶ 84, 183). As Defendants point out, the problem here is that the March 10, 2002 and March 12 2001, statements preceded the alleged renegotiation and thus

---

**30.** Plaintiffs also allege that revenue recognition on I–Parts' promissory note and stock, which I–Parts issued in satisfaction of invoices received from Answerthink, was improper. Complaint ¶¶ 125, 131. Again, however, the Complaint fails to allege sufficient facts to establish that the note was worthless when it was issued, that each Defendant knew it was worthless or was severely reckless in not knowing that it was worthless, or that each Defendant benefitted from the alleged improper revenue recognition.

cannot logically be false at the time they were made. Similarly, by Plaintiffs' own allegations, since the rate concession impacted margins "during the first quarter of fiscal 2002," statements in the Company's 2001 Form 10–K cannot be actionable *Id.*

Further, staffing the WMI project with a high number of people working long hours does not allege fraud. Particularly because WMI was its largest revenue producing customer during the Class Period, staffing the project heavily does not seem unusual, and certainly does not support a strong inference of scienter.

*(2) Alleged Failure to Establish Sufficient Reserves*

█ Plaintiffs state that when Defendants reported their financial results for each quarter beginning in the fourth quarter of 1999 and ending in the third quarter of 2001, they fraudulently reported inflated revenue partly due to their failure to keep sufficient reserves. *See* Complaint at ¶¶ 106, 120, 127, 135, 141, 147, 160, 169, and 177. Plaintiffs state that a failure to keep reserves violates GAAP, which in turn violates the SEC regulation mandating that filings be prepared in accordance with GAAP. *Id.* at ¶¶ 106, 162, and 188. Even if GAAP violations were adequately alleged, however, these violations are not sufficient to establish scienter. The Eleventh Circuit has explained that violations of GAAP. "standing alone, do not satisfy the particularity requirement of Rule 9(b)." *Ziemba v. Cascade Int'l., Inc.*, 256 F.3d 1194, 1208 (11th Cir.2001); *see In re Citrix Sys.*, Civ. No. 00–6796, 2001 U.S. Dist. LEXIS 25351, at *16 (S.D.Fla. Sept. 29, 2001) (stating that GAAP violations alone are insufficient to plead fraud) (*quoting Ziemba*, 256 F.3d at 1208); *Cheney*, 2000 WL 1140306 at *11 (stating that GAAP violations can establish scienter *when coupled with red flags*, such as the resignations of auditors and restatements

of audit results). The cases Plaintiffs cite for the proposition that GAAP violations provide evidence of scienter agree with the Eleventh Circuit that GAAP violations by themselves are insufficient to establish scienter. *In re Triton Energy Limited Sec. Litig.*, 5:98–CIV–256, 2001 WL 872019, at *10–11 (E.D.Tex. March 30, 2001), 2001 U.S. Dist. LEXIS 5920, *33 (stating that the contention that GAAP violations by themselves are insufficient to establish scienter is well-founded); *In re Raytheon Sec. Litig.*, 157 F.Supp.2d 131, 147 (D.Mass.2001) (denying dismissal not because of the GAAP violations alone, but because of the magnitude of the overstatement resulting from the violations, more than $200 million in excess of the write down of $310 million, was significant).

█ To bolster their statements regarding insufficient reserves, Plaintiffs cite to cases denying motions to dismiss securities fraud complaints which included allegations regarding insufficient reserves. Opposition at 19 (*citing In re Telxon Corp. Sec. Litig.*, 133 F.Supp.2d 1010 (N.D.Ohio 2000); *In re U.S. Aggregates, Inc. Sec. Litig.*, Civ. No. 01–1688 CW, 2003 WL 252138, at *1–2 (N.D.Cal. January 24, 2003), 2003 U.S. Dist. LEXIS 12168, at *6, *In re Complete Management Inc. Sec. Litig.*, 153 F.Supp.2d 314, 340 (S.D.N.Y. 2001); *In re Nortel Networks Corp. Sec. Litig.*, 238 F.Supp.2d 613, 626–632 (S.D.N.Y.2003); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir.2002)). These courts' decisions, however, did not necessarily turn on the allegation of insufficient reserves. In fact, in *Telxon*, the court specifically stated that this allegation was insufficient:

> While some of these alleged accounting manipulations, by themselves, would appear to be entirely discretionary, *such as in which quarter bad debt should be recognized*, other nearly create a strong

inference of, at least, recklessness even when considered in isolation.

133 F.Supp.2d at 1030 (emphasis added); *see also U.S. Aggregates,* 2003 WL 252138 at *4–5, 2003 U.S. Dist. LEXIS at *16 (concluding that allegations were sufficient to state a claim for securities fraud because of particularized allegations that the defendant was aware of specific accounting improprieties and directed them, such as telling staff to change financial reports to make it appear as if the company were meeting its financial targets); *Nortel Networks,* 238 F.Supp.2d at 625 (stating that one of the reasons, of which keeping a low reserve was not one, that allegations were sufficient was because the defendant company recognized revenue based on letters of intent). In other cases cited by Plaintiffs, the defendant companies had not reserved for certain questionable accounts at all. *See Complete Management Inc.,* 153 F.Supp.2d 314, 319 ("In its accounting, [the defendant company] did not establish any reserve for doubtful accounts that might not be collectible."); *Aldridge,* 284 F.3d 72 (reversing dismissal where no reserve was established). In this case, however, the Complaint did not establish that Defendant did not maintain any reserves throughout the Class Period. Plaintiffs acknowledge that Answerthink's 1999 year-end financial statements reflected a reserve of $1,510,000 (Complaint ¶ 110) and that by the next year the reserve had increased to $11,122,000 (*Id.* at ¶ 147). Plaintiffs have not alleged with particularity that the amount Defendants kept in reserve was so low that its reports of revenue were fraudulent. Plaintiffs do not dispute that Defendants maintained a reserve for bad debt, and Plaintiffs' allegations are essentially a disagreement over how much bad debt should have been in-

cluded. The argument that Defendants should have reserved more they did, particularly when they already reserved well over a million dollars and adjusted the amount each year, does not reflect an extreme departure from the standards of ordinary care, and therefore does not support an inference of scienter.

*(3) Alleged Failure to Disclose Related Party Transactions*

Plaintiffs make a number of allegations, including GAAP violations and "round-tripping,"[31] against Defendants for not disclosing related party transactions. ¶¶ 104, 115, 121, 123, 125, 129–131, 136–137, 138–139, 148, 154–155, 162, and 169. GAAP FASB 57 requires financial statements to include disclosures of material related party transactions. The disclosures shall include (a) the nature of the relationships involved, (b) a description of transactions, including transactions to which no amounts or nominal amounts were ascribed, (c) the dollar amounts of transactions, and (d) amounts due from related parties. *Id.* SEC Regulation S–X exempts disclosures of related party transactions in quarterly or other interim financial statements unless they are material. §§ 210.10–01(5), 210.4–08(k). Plaintiffs allege that Defendants failed to disclose their transactions with WCOL in a SEC filing for the year 1999. The Complaint states that the Company had recognized $1,746,000 of revenue on transactions with this party and that WCOL owed the Company $108,018.76 in that year. ¶ 115. Plaintiffs cite cases in which courts denied motions to dismiss as to certain defendants who had failed to make proper disclosures regarding related party transactions. *See In re Enron Corp. Sec., Derivative and ERISA Litig.,* 235 F.Supp.2d 549 (S.D.Tex.2002); *Yuan v.*

---

**31.** Plaintiffs use the term "round-tripping" to describe transactions through which An-

swerthink recycled money back to itself through ITP and related parties.

*Bayard Drilling Technologies, Inc.*, 1999 WL 1455756 *6–7 (W.D.Okla.1999).

 Defendants admit that Answerthink "mistakenly failed to disclose in its 2000 Proxy that it had done a small amount of business with WCOL in 1999." The WCOL revenue represented 0.67 percent of its $260,460,000 in revenue that year. *See* RJN Exh. B at 18. Further, although Defendants did not disclose in its 2000 Proxy that Answerthink did business with WCOL, the Company was fully paid for this business, and it disclosed larger transactions with the related entity the following two years. *See* RJN Exhs. H at 10–11, J at 9. Further, while the Company did business with related parties through 2000 and 2001, these transactions were disclosed in accordance with SEC rules (RJN Exhs. C at 39, B at 44, G at 9, H at 10–11, J at 9), and, in any event, represented only 16.7 million in 2000 and $2.1 million in 2001 (Complaint ¶ 183) of the Company's $311 million and $247 million, respectively (RJN Exh. B at 18), in revenues during those two years. Based on these numbers, I conclude that the allegations regarding related parties do not sufficiently allege materiality. There are no allegations that the failure to disclose was intentional or that Defendants continued to fail to disclose the related party transactions, as was the case in *Enron*, and there are no allegations that the related party transactions required Answerthink to outlay one-half of its total capital expenditure budget, as in *Yuan. Enron*, 235 F.Supp.2d at 621 n. 55; *Yuan*, 1999 WL 1455756 at *7. I conclude that the amount of business done with WCOL is de minimus when compared to the overall revenue Answerthink reported during the Class Period, and thus, when taken in context of Defendants' further dealings and disclosure with WCOL, does not adequately allege materiality.[32]

In addition to alleging GAAP violations and a failure to disclose in relation to Answerthink's related party transactions, Plaintiffs allege that Defendants engaged in round-tripping as a way of fraudulently recognizing revenue. Plaintiffs argue that Defendants inflated Answerthink's revenues by recycling money through related parties and then back to itself in the form of a sale. They allege in the Complaint that ITP provided venture capital to WCOL on the condition that it be used to purchase Answerthink services.[33] Complaint ¶ 59. They cite cases where motions

32. Plaintiffs argue in their Opposition that materiality is an issue "more appropriately reserved for the trier of fact." Opp. at 27 n. 13 (*citing Fecht v. Price Co.*, 70 F.3d 1078, 1080 (9th Cir.1995); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 163–164 (2d Cir.2000)). The Eleventh Circuit, however, has stated that materiality is a necessarily element in a claim for securities fraud. *Bryant*, 187 F.3d at 1281. The cases Plaintiffs cite specifically state that the materiality issue cannot be determined as a matter of law in the particular cases before them. *Fecht* acknowledges that materiality can be determined as a matter of law if the materiality of a statement is so obvious that reasonable minds could not differ as to the result. *Fecht*, 70 F.3d at 1081. *Ganino* simply rejects using a formulaic approach to determine materiality, and it distinguishes other cases which did find certain numbers to be immaterial by stating that those cases were faced with different circumstances. *Id.* (*citing Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir.1997) (stating that misrepresentations, which amounted to 2% of total assets, were immaterial as a matter of law taken in context); *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 (1st Cir.1996) (concluding that a 3% to 9% drop in quarterly revenue was immaterial as a matter of law)).

33. Plaintiffs liken Defendants' use of ITP to *Novak v. Kasaks*, 216 F.3d 300 (2d Cir.). *Id.* at 311–312. That case vacated dismissal because plaintiffs sufficiently pled that defendants knew statements were false at the time they were made. That is not the case here, as explained in Part V.A.(4)(c), *infra*.

to dismiss securities fraud claims have been denied because parties engaged in round-tripping or recycled money back to themselves. Plaintiffs' Opposition at 12 (*citing In re Homestore.com, Inc. Sec. Litig.*, 252 F.Supp.2d 1018, 1024–1025 (C.D.Cal.2003); *In re Northpoint Communications Group Inc. Sec. Litig.*, 221 F.Supp.2d 1090; *In re Lernout & Hauspie Sec. Litig.*, 208 F.Supp.2d 74 (D.Mass. 2002)).

Plaintiffs, however, have failed to allege how Answerthink's transactions with the related parties were indeed round-tripping. In *Homestore.com*, the defendant company paid a third party cash in exchange for services, and the third party then recycled the money back to the company in exchange for services. All Plaintiffs have alleged in the instant case is that ITP provided funding to WCOL, and WCOL purchased services from Answerthink for cash; there are no allegations that Answerthink paid WCOL cash, either directly or through ITP. Thus, unlike the cases Plaintiffs cite, there are insufficient allegations here that Answerthink engaged in "round-trip" transactions or recycled money back to itself through related parties.

*(4) Insufficient Allegations of Indicia of Scienter Based on Aging Reports, FreshPlex Report, and Confidential Witnesses*

Plaintiffs allege three items of information to support their claim of improper revenue recognition and low reserves in connection with related and non-related party transactions: (1) three of Answerthink's Aging Reports, (2) a FreshPlex Financial Recap Report (the "FreshPlex Report"), and (3) the purported observations of confidential witnesses. Plaintiffs argue that the Defendants closely monitored Answerthink's uncollectible accounts through the sources listed above. They cite *In re Sensormatic Elecs. Corp., Sec. Litig.*, Civ. No. 01–8346, 2002 WL 1352427 (S.D.Fla. June 10, 2002), 2002 U.S. Dist. LEXIS 10715, in support of their arguments.[34] In that case, the court stated, "Where a defendant publishes a statement at a time he is in possession of or has access to facts suggesting that the statement is inaccurate, misleadingly [sic], or incomplete ... a classic fact pattern giving rise to a strong inference of scienter appears." *In re Sensormatic Elecs. Corp.*, 2002 WL 1352427, at *6, 2002 U.S. Dist. LEXIS 10715, *17.

■■■■ The problem is that Plaintiffs fail to sufficiently allege knowledge of false statements or adverse material facts with respect to each item showing that revenue recognition decisions were improper at the time each was made. There is nothing suspicious about the existence of Aging Reports, nor do the Aging Reports on their face sufficiently raise any inference that the Defendants knew at the time they issued an invoice that it was uncollectible as to the customers identified. In *In re Northpoint Communications Group, Inc. Sec. Litig.*, 221 F.Supp.2d 1090 (N.D.Cal. 2002), the plaintiffs based their action for securities fraud on allegations of improper revenue recognition, failure to record loss-

---

**34.** Again, Plaintiffs cite to a case with inapposite facts. In *Sensormatic Electronics*, the district court payed particular attention to the fact that there had been heavy insider trading when granting in part the motion to dismiss. *Id.* 2002 WL 1352427 at *6–7, 2002 U.S. Dist. Lexis 10715, at *18–*19. The individual defendants sold up to 95% of their Sensormatic stock during the class period just weeks before the fraud was revealed, reaping nearly eight million dollars in insider trading proceeds. *Id.* at *1–2, 2002 U.S. Dist. Lexis 10715, at *4. None of these defendants had sold stock during 1999 or 2000 (the class period was August 8, 2000 through April 9, 2001). *Id.* at *7, 2002 U.S. Dist. Lexis 10715, at *19.

es for uncollectible receivables, stock sales by three officers, and a looming merger as a motive for fraud. *Id.* The corporation and officers moved to dismiss, and the court granted the motion in part. *Id.* Plaintiffs' allegations included references to aging reports to support their claim that the defendant corporation violated GAAP by recognizing revenue not reasonably assured of receipt. *Id.* at 1099. After explaining that a "GAAP violation is not always tantamount to fraud," the court stated that the revenue recognition allegations were insufficient to establish a strong inference of scienter by themselves, partly because the defendants had increased the reserve for bad debt. *Id.* at 1100. Similarly, in another securities fraud case, the court dismissed a complaint partly because it merely alleged the existence of aging reports, but did not establish a strong inference of fraud. *Coates v. Heartland Wireless Communications*, 26 F.Supp.2d 910, 920–921 (N.D.Tex.1998). The court explained that to survive the PSLRA's pleading requirements, the allegations regarding aging reports should have included more details. *Id.* The court stated the following:

> To establish a strong inference of fraud, plaintiffs must provide more details about the alleged negative internal reports, such as report titles, when they were prepared, who prepared them, to whom they were directed, their content, and the sources from which plaintiffs obtained this information.

*Id.* Thus, the mere existence of Aging Reports and the FreshPlex Report and the purported observations of confidential witnesses do not sufficiently allege that Defendants were privy to specific information that revealed statements were false at the time they were issued or that Defendants benefitted personally from alleged misrepresentations.

### (a) Aging Reports

There are no specific and particularized allegations in the Complaint that any Defendant "knew" that the items included in the Aging Reports were uncollectible at the time the work was done and the revenue was booked. Indeed, the purpose of the Aging Reports is to assist in collection. The Aging Reports, with one exception, do not even address the related companies.[35] WCOL was not included in the Aging Reports, so it is unclear how Plaintiffs determined the amount of the WCOL invoices that were uncollectible. Plaintiffs fail to allege particularized facts that any of the amounts listed in these Aging Reports were uncollectible, when they became uncollectible, or even that they remained uncollected. The Aging Reports do not even list a due date for the invoices, or establish what management knew about each receivable at any particular time. There are no facts alleged which permit any correlation between the Aging Reports and the reserves; the reports do not indicate what had been reserved for and what had not. Rather, Plaintiffs argue (without citing any facts) that every invoice listed in the Aging Reports was "clearly uncollectible" and should have been reserved (an allegation that assumes these amounts were not already reserved) or written off. Complaint ¶¶ 107–110. These statements, however, constitute unsupported legal conclusions or opinions. *Cheney v. Cyberguard Corp.,* 2000 WL 1140306 at *3 ("The Court should

---

**35.** Paragraph 107 of the Complaint lists Netera, later re-named eSavio, as the only related party included in the Aging Reports. Neither of the two Aging Reports in Paragraphs 134 and 145 list any related party receivables.

Plaintiffs offer no allegation as to why the remaining related party transactions were not included, assuming, as do the Plaintiffs, that the related party invoices were aging.

ignore those allegations that contain no more than opinions or legal conclusions."). In sum, the statements regarding Aging Reports fail to allege that the invoices were uncollectible at the time they were listed on the reports, and the mere fact that some receivables later turned out to be uncollectible does not establish a reasonable inference of scienter.[36]

#### (b) FreshPlex Report

■ Plaintiffs' second source of information, the FreshPlex Report, does not sufficiently allege or establish any sufficient factual support for scienter relating to Plaintiffs' claim of improper revenue recognition. Plaintiffs fail to allege, as required, any specificity as to who prepared the report, when it was prepared, for what purpose it was prepared, or to whom it was disclosed. No facts are alleged which even connect the Report to any Defendant. According to Plaintiffs, this report was a PowerPoint presentation which indicated that as of December 29, 2000, related party WCOL had an outstanding debt to Answerthink in the amount of $4,229,946. Complaint ¶ 54. The Report does not speak to any other customer. Nothing in the FreshPlex Report supports a reasonable inference that WCOL's debt was uncollectible at the time Answerthink recorded revenue of the transaction. Nor is there anything in the Report which speaks to the reserves established on the Company's receivables. The Company's Definitive Proxy Statement, filed April 6, 2001, and incorporated in the Company's 2000 10–K, disclosed that as of December 29, 2000, the Company's accounts receivable from WCOL totaled $4,737,000. RJN Exh. H at 11. During the year 2000, WCOL paid the Company almost $6 million dollars. *Id.* Indeed, in the fourth quarter of 2000, the Company substantially reserved against other dot-com related receivables including WCOL. Complaint ¶ 140. Thus, the FreshPlex Report fails to support Plaintiffs' allegations that Answerthink improperly recognized revenue.

#### (c) Confidential Witnesses

Finally, Plaintiffs rely on information from seventeen unidentified witnesses to support their claims that Answerthink improperly recognized revenue in relation to related companies and WMI. Complaint ¶¶ 51–68, 75–79, 88. There are two problems with these confidential witnesses: (1) they do not allege that Defendants knew or were severely reckless in not knowing

---

**36.** In their Notice of Filing Supplemental Authority (DE # 68, filed November 5, 2003), Plaintiffs submitted *In re Sears, Roebuck and Co. Sec. Litig.*, 291 F.Supp.2d 722, 727 (N.D.Ill.2003). In this case, the court denied dismissal of a complaint alleging that defendants misled investors to believe that Sears maintained sufficient reserves for uncollectible accounts. The court stated that "[p]laintiffs specifically allege[d] that the positions held by each of the individual defendants during the Class Period gave them knowledge of the specified information in question." *Id.* at 727. The plaintiffs in that case supported their allegations with statements made by defendants themselves. *Id.* These allegations indicated that defendants knew information that was contrary to representations they had made to the public regarding certain transactions' expected profits. *Id.* In the instant action, Plaintiffs suggest that by virtue of their positions, Defendants should have known that certain companies would not be able to pay Answerthink months down the road. Plaintiffs fail to allege any particularized facts that Defendants knew this information at the time they made their alleged misrepresentations and instead attempt to rely on Defendants' high positions as evidence of scienter. *See Cheney,* 2000 WL 1140306, at *9 ("[I]t is well-established that '[a]llegations that a director or officer signed public disclosures and/or was involved in the company's daily operations, standing alone, will not satisfy the pleading requirements of the PLSRA or Rule 9(b).'") (quotation omitted).

that they were making false statements, and (2) they simply reflect a difference of business judgment between the employees and Defendants.

### (1) No allegations that employees confronted Defendants with falsity

None specifically allege that they "told" any Defendant that the accounts were uncollectible; only that it was "generally known"—that is not sufficient. The cases Plaintiffs cite as support for their use of confidential sources include allegations where employees actually confronted Defendants with the fraud. *In re Sunbeam Securities Litigation,* 89 F.Supp.2d 1326, 1338 (S.D.Fla.1999) (denying motion to dismiss as to some defendants because employees confronted them regarding fraudulent practices); *see also* Opposition at 30 (*citing Zuckerman v. Smartchoice,* Civ. No. 6:99–237, 2000 WL 1887517 (M.D.Fla. May 18, 2000), 2000 U.S. Dist. LEXIS 14676 (recommending dismissal be denied partly because plaintiffs alleged that employees actually discussed improper revenue recognition with CEO); *Holmes v. Baker,* 166 F.Supp.2d 1362 (S.D.Fla.2001) (granting in part motions to dismiss because employee allegedly presented management with a memorandum describing defendant company's financial irregularities)). Plaintiffs also rely on *In re Theragenics Corp. Sec. Litig.,* 137 F.Supp.2d 1339 (N.D.Ga.2001) for the proposition that the statements from its confidential sources plead fraud with particularity. Even this case specifies that to plead securities fraud, statements from confidential witnesses need to be bolstered by other facts "that provide an adequate basis for believing that the defendants' statements were false." *Id.* at 1345.

**37.** *See supra* Part V.A(3).

■ Nowhere in the Complaint does an employee allege actually approaching an individual Defendant and telling him that a company did not have the ability to pay its bills. In the many allegations concern related parties, which comprise a small portion of the overall revenue of the Company,[37] Plaintiffs fail to plead with particularity that the unidentified employees told Defendants that certain accounts were uncollectible. Plaintiffs attempt to meet their burden by reference to witnesses who purportedly claimed that the related parties' inability to pay Answerthink was "known" or "common knowledge" within the Company. Complaint ¶¶ 48, 60, 63, 74, 76. The problem is that these statements are not supported by other facts establishing a severe recklessness that Answerthink and its officers and directors knew that the related accounts were uncollectible at the time the Company reported its revenues. Plaintiffs allege that ITP, through its investments in related parties, was the gateway to Defendants' knowledge that these customers were in a precarious financial condition and could not pay their bills. Complaint ¶¶ 45, 52, 73, 79. According to Plaintiffs, ITP required these parties to engage in transactions with Answerthink as a condition for receiving additional funding. *Id.* at ¶¶ 47, 59, 67, 68. While alleging purported conflicts of interest (*Id.* at ¶¶ 46, 52, 60, 67, 68), Plaintiffs attempt to establish scienter, but without specific facts which, if true, establish that any revenue was uncollectible at the time it was booked. The only fact Plaintiffs can establish through these allegations is that ITP invested in these companies. This, however, does not establish a reasonable inference of scienter. The vague and conclusionary allegations relating to confidential informants do not cure this defect.

*(2) Difference in business judgment*

Finally, much of former employees' alleged statements simply reflect that these employees and Defendants had different business judgments. These allegations insufficient to establish scienter. *See Smith Gardner*, 214 F.Supp.2d at 1303 (granting dismissal where complaint was "based on [d]efendants' business judgment concerning the timing of revenue recognition"). Plaintiffs' allegations amount to no more former employees who either disagreed with management's decisions or held personal beliefs unsupported by particularized factual allegations. For instance, Plaintiffs allege that a "former Answerthink [consulting] director" purportedly claimed that "it was absolutely common knowledge" that I–Parts, VisualPlex and eSavio "were not good credits" and "were not going to be able to pay" (Complaint ¶ 48), that Answerthink "overstaffed" the Visual-Plex project "in order to drive up revenues" (*Id.* at ¶ 73), that Fernandez made final decisions on whether or not to continue working for WCOL, and that certain employees disagreed with those decisions. *Id.* at ¶¶ 54, 55, 58, 66. Yet another confidential source, a former WCOL Program Manager convinced Answerthink Director Harry Chasen in June or July 2000 that a particular WCOL project called FreshPlex should be terminated because of its poor results. *Id.* at ¶¶ 57–58. Chasen later told the Program Manager that the program would not be terminated per Fernandez's decision not to terminate it. *Id.* at ¶ 58. WCOL finally ended the project in November. *Id.* at ¶ 58. These allegations simply reflect a difference of opinion as to how to operate a business. They do not allege fraud because the FreshPlex Report Plaintiffs attempt to use as support does not contain any indication that WCOL's outstanding debt was uncollectible at the time Answerthink recorded revenue on transactions.

These unsubstantiated beliefs and conclusionary statements lack requisite specificity and indicia of reliability to satisfy the scienter requirement. In sum, although these employees allegedly claim that it was "known" that related parties did not have the ability to pay, the allegations fail to provide any specifics such as who had this knowledge, when each employee had this knowledge, and whether the accounts affected were recognized as revenue. Further, these employees make no statements regarding the reserve, such as whether the reserve covered uncollectible accounts.

*(5) Plaintiffs' Motive and Opportunity Allegations*

Plaintiffs' Complaint argues a "motive and opportunity theory" of alleging scienter. Plaintiff's Opposition Brief at 31–37. Plaintiffs attempt to plead with particularity by alleging the following motives on the part of Defendants: a desire to sell their Answerthink shares at inflated prices, maintain the value of their stock options, increase the size of their bonuses, and maintain the image of a "high-growth" company to create the illusion that it was meeting analysts' expectations in order to attract a buyer. The Eleventh Circuit, however, held in *Bryant* that it "reject[s] the notion that allegations of motive and opportunity to commit fraud, *standing alone*, are sufficient to establish scienter in this Circuit." *Bryant*, 187 F.3d at 1285 (emphasis added). The Eleventh Circuit explained the following:

> We quantify scienter as encompassing at least a showing of severe recklessness, and although motive and opportunity to commit fraud may under some circumstances contribute to an inference of severe recklessness, we decline to conclude that they, standing alone, are its equivalent .... Motive and opportunity ... do not constitute a substantive stan-

dard; rather, motive and opportunity are specific kinds of evidence, which, along with other evidence might contribute to an inference of recklessness or willfulness.

*Bryant,* 187 F.3d at 1285–1286.

As the *Bryant* court recognized, motives such as greed can be ascribed to any company insider and are thus fundamentally inconsistent with the provisions of the Reform Act that require allegations of specific facts that establish scienter. *Id.* at 1285 (citation omitted). Applying these principles, I conclude that there are insufficient allegations of "motive and opportunity" in the Consolidated Amended Complaint to contribute to an inference of recklessness or willfulness. I will first examine Plaintiffs' allegations of insider trading, and then I will address the remaining motive and opportunity allegations.

(a) Insufficient Claims That Stock Trades Establish Scienter

Plaintiffs' theory of scienter is partly based on the contention that Defendants made false and misleading statements so they could maintain the value of their stock options, increase the size of their bonuses, and sell their Answerthink shares at inflated prices. Complaint ¶¶ 92–94, 97, 98, 99. Plaintiffs cite *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72 (1st Cir.2002) to support their arguments. In this case, the exercise price of the individual defendants' stock options was lowered in 1997, and the exercise price was lowered again to match

the market price in December 1998 (the class period was from September 17, 1997 and April 22, 1999). *Id.* at 84. The court stated, "When financial incentives to exaggerate earnings go far beyond the usual arrangements of compensation based on the company's earnings, they may be considered among other facts to show scienter." [38] *Id.* at 83. Defendants' argue in their Motion to Dismiss that the absence of insider selling in this case actually negates a strong inference of fraud. Plaintiffs respond that "courts routinely uphold complaints alleging securities fraud in the absence of such allegations." [39] Opposition at 36 (*citing No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 938–939 (9th Cir.2003); *In re Hamilton Bankcorp Inc. Sec. Litig.,* 194 F.Supp.2d 1353, 1356 (S.D.Fla.2002)).

 The first problem with Plaintiffs' theory is that Defendants' stock trades refute any inference of scienter. While a showing of profitable stock trades is not a prerequisite to prove scienter, where it is alleged, plaintiffs "bear the burden of showing that sales by insiders were in fact unusual or suspicious in amount and in timing." *Cheney v. Cyberguard Corp.,* 2000 WL 1140306, *8 (S.D.Fla.2000) (quoting *Lirette v. Shiva Corp.,* 27 F.Supp.2d 268, 283 (D.Mass.1998)). One fact necessary to a showing of unusualness is the amount of trading that the insider conducted before or after the Class Period. *Id.*

---

**38.** Unlike the defendants in the instant case, the defendants in *Aldridge* failed to establish any reserve for uncollectible bad debt. 284 F.3d at 79.

**39.** In these cases, the courts concluded scienter was pled partly because of the fact that insider trading had occurred. *No. 84 Employer–Teamster Joint Council Pension Trust Fund,* 320 F.3d at 938–939 ("Given the large number and percentages of stocks traded, the

timing of the sales, and the prior trading history of each defendant ... the stock sales by the individual defendants were unusual and suspicious and give rise to a strong inference of scienter."); *Hamilton,* 194 F.Supp.2d at 1358 (stating that the complaint, which included allegations of insider sales, gave rise to a strong inference of the defendants' scienter).

Whether insider trading will support an inference that defendants engaged in securities fraud "turns upon (1) the percentage of holdings sold by a defendant, (2) the number of defendants who sold stock, and (3) the difference between stock sales during the relevant time period and prior activity." *In re John Alden Financial Corp. Sec. Litig.*, 249 F.Supp.2d 1273, 1282 (S.D.Fla.2003).

 Here, Plaintiffs allege insider sales by only two Defendants, Miller and Frank. Complaint ¶¶ 95, 96. Upon examination of Miller and Frank's trades, and those of the other Defendants who, according to the Plaintiffs, are the central players in the fraudulent scheme, it becomes clear that Plaintiffs' allegations are insufficient to establish that trading was suspicious or unusual. In fact, the absence of allegations against key players refute any inference of scienter. First, Ted Fernandez, the Company's Chief Executive Officer, who is a focal point of the Complaint, and, according to Plaintiffs, a necessary participant in the scheme to defraud, sold no stock during the Class Period, despite his significant holdings of 1,466,670 shares. *See* RJN Exh. J at 16 n. 3. Rather, he personally lost approximately 39 million dollars, as the value of his shares declined over 82% from its peak to the end of the Class Period.[40]

Second, Jack Brennan, the CFO of the Company, was allegedly one of the "ultimate decision makers on when to recognize revenue or take a write off." Complaint ¶ 109. Yet despite his purported central role in the alleged scheme to artificially inflate Answerthink's financial results, Brennan's trades are not consistent with Plaintiffs' theory of scienter. Brennan had two trades during the Class Period: one sale and one purchase. On November 14, 2001, he sold 6,500 shares (or 4.78%) of his holdings at $4.70 per share. *See* RJN Exh. T. Then, on February 5, 2002, several weeks before the Company allegedly revealed the "truth" concerning its purported financial fraud, Brennan purchased 6,494 shares at $3.08 per share. *See* RJN, Exh. U. The sale of less than 5 percent of his stock substantially below the Class Period high and the purchase back of almost the same amount of stock just weeks before the purported fraud was revealed, is insufficient to establish scienter. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d. Cir.1995) (concluding that there is no inference of scienter where defendant sold approximately 11% of holdings); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir.2001) (stating that sale of 17% of insider's holdings did not support inference of scienter).

Third, Plaintiffs claim that Allen Frank, the Company's President, sold a "significant portion" of his Answerthink stock between May 2001 and December 2001. Complaint ¶ 96. In actuality, however, Frank sold only 9% (130,000 shares) of his total holdings in Answerthink stock, between May 15, 2001 and December 4, 2001. *See* RJN Exhs. O, P, Q. The trades were in blocks between 100 and 15,000 shares at prices between $5.00 and $6.30 per share.

---

**40.** The fact that the CEO, who held a significant amount of shares and who would have been an essential participant in any fraudulent scheme, did not sell stock undermines any suggestion of knowledge on the part of the defendants due to any other claimed inside sells. *In re John Alden Financial Corp. Sec.Litig.*, 249 F.Supp.2d 1273, 1282 (S.D.Fla. 2003); *Chan v. Orthologic Corp.*, 1998 WL 1018624, at *12 (D.Ariz. Feb. 2, 1998) (holding that scienter was not adequately pled where "many of the individuals who had large holdings in the company and sold stock during the period in question retained more shares than they sold. Accordingly, these individuals suffered greater financial losses than gains.").

*See id.* He ultimately retained over 1.3 million shares during the Class Period. Considering the amount of the stock sold, there is nothing unusual or suspicious in the timing or amounts of Frank's sales.[41] The fact that Frank sold a relatively small fraction of his shares at the low end of the market during the Class Period refutes scienter.

Fourth, Plaintiffs allege that Miller, a member of the Company's Board of Directors during the Class Period[42], sold his shares between $4.08 and $5.84 per share, for gross proceeds of approximately $2.57 million dollars. Complaint ¶ 14; *see* RJN, Exhs. R, S. Plaintiffs argue that a desire to avoid a margin call is sufficient to plead scienter. Opposition at 36, *citing In re WorldCom Sec. Litig.*, 294 F.Supp.2d 392, 416–17 (S.D.N.Y.2003). In this case, the court stated that the allegations regarding defendant Ebbers' financial incentives were "unique and substantial." *Id.* These allegations included that (1) Ebbers' WorldCom shares provided a crucial underpinning for his complicated personal finances, including stock transactions, the purchase of hundreds of thousands of acres of land for hundreds of millions of dollars, and his considerable personal loans from WorldCom and Citigroup; (2) he had at least $900 million in loans secured by his WorldCom holdings, including a $400 million loan from WorldCom that was reported to be the largest amount ever loaned by a corporation to one of its officers; and (3) in order to avoid or mitigate margin calls from lenders, Ebbers faced substantial pressure to maintain the price of the WorldCom stock that was serving as his collateral. *Id.* In contrast, Plaintiffs' single allegation regarding Miller's trading is his forced sale of stock over a two-week period to meet a margin call. Complaint ¶ 95. A forced sale, however, does not support any inference of scienter because Miller had no control over the timing or circumstances of the sale. *See In re MCI Worldcom, Inc. Sec. Litig.*, 191 F.Supp.2d 778, 792–93 (D.Miss.2002) (*citing Coates v. Heartland Wireless Comm. Inc.*, 26 F.Supp.2d 910, 920 (N.D.Tex.1998) (stating that a forced sale of stock does not raise a strong inference of scienter)). Additionally, although not determinative, if Miller intended to maximize his return of collateral (the Company stock), and had control over the situation, he presumably would have sold his shares days or weeks earlier at significantly higher prices.[43] Thus, Plaintiffs have failed to allege insider trading adequately.

### (b) Remaining Motive and Opportunity Allegations

In addition to their allegations regarding insider trading, Plaintiffs' allegations that Defendants wanted to "cook the books," maintain the value of stock options, and

---

41. Plaintiffs do not take issue with the insignificance of Frank's sales, but argue that the timing of these sales was suspicious. Plaintiffs, however, have alleged no facts or chronology of events that support that Frank's sales were made at suspicious times, especially when his trades were in small blocks over a six-month period at prices substantially below the market high. *See* RJN Exhs. O, P, Q.

42. Plaintiffs offer no allegations that two other outside directors, Kessinger or Rauner, sold any shares during the Class Period, although each is a named defendant is the

Complaint. The fact that four of the six Defendants traded little or no Answerthink stock, despite their opportunity to realize large gains from doing so, is inconsistent with the inference that Answerthink manipulated its earnings and issued misleading financial statements.

43. Had Miller shares been sold two days earlier (November 27, 2000), he would have received proceeds of $4.1 million dollars. *See* RJN Exh. A.

find a buyer for the Company are insufficient. The Plaintiffs argue that the Defendants were motivated to "cook the books" in order to maintain the price of Answerthink stock so consultants would not leave the Company in favor of its "more Internet-based peers." Opposition at 32. Plaintiffs contend that the "Company's reported financial figures were in line with Wall Street estimates in virtually every quarter during the Class Period" and had Answerthink missed its projections, it "would have led to a significant sell-off and stock price drop." *Id.* at 32. They argue that the desire to post favorable financial results in order to regain or attract market attention has been considered relevant in establishing severe recklessness. *See Smart Choice*, 2000 WL 1887517 at *1–2 (M.D.Fla.2000), 2000 U.S. Dist. LEXIS 14676 at *3–*4; *In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 646 (E.D.Va.2000).[44] Plaintiffs' Complaint, however, fails to allege specific facts that support the "cooking the books" claims. Paragraphs 27 and 32, upon which Plaintiffs rely, only allege that Answerthink "failed to reap the benefits of the Internet boom" and "Answerthink's stock price has stagnated and has significantly underperformed its more Internet-oriented peers."

▪▪▪ Notwithstanding, the Plaintiffs argue that the Defendants were motivated to commit fraud in order to meet analysts' estimates; that is, they were motivated to "cook the books" to maintain the price of Answerthink's stock so consultants would not leave the Company. General allegations of motive, such as maintaining a company's stock price or meeting analyst estimates, do not support a strong inference of scienter. *In re Sunbeam*, 89 F.Supp.2d at 1341 (granting dismissal as to a particular defendant because the allegations against him, that he was on the corporation's operating committee, he desired to see the corporation succeed, and he received an incentive-based compensation plan, could "be ascribed to virtually all corporate officers and directors" and thus failed to raise a strong inference of scienter (quotation omitted)). Thus, Defendants' alleged desire to meet quarterly projections, find a buyer for the Company, and increase the value of their stock options do not raise a strong inference of scienter, as required by the PSLRA.

In sum, Plaintiffs have failed to plead scienter with the particularity required under the Reform Act. They have not alleged that Defendants knew, or were reckless in not knowing, that particular statements were false when they were made or that the allegedly false or misleading statements were materially misleading. Accordingly, Plaintiffs have failed to allege three of the five elements necessary to state a claim under the PSLRA, and dismissal is appropriate.

## B. Proximate Cause

The Eleventh Circuit has stated that the fifth element of a securities fraud claim under Rule 10b–5 is that the misstatement or omission proximately caused the plaintiff's injury. *See Bryant v. Avado Brands, Inc.*, 187 F.3d at 1281. In order to allege proximate causation, Plaintiffs must show

---

**44.** Neither of these cases held that the desire to post strong earnings is sufficient to establish scienter. In *MicroStrategy,* the court stated that the general allegation of meeting Wall Street estimates "adds little by itself to the scienter calculus, because these motives are 'possessed,' to a certain degree, by every corporate officer." 115 F.Supp.2d at 647–648.

In *Smart Choice,* the court concluded that the allegations were sufficient to plead scienter because they showed defendant's "willful blindness" of fraudulent practices, coupled with defendant's desire to post favorable earnings. 2000 WL 1887517 at *6, 2000 U.S. Dist. LEXIS 14676 at *16–*17.

that the Defendants' fraud was in "some reasonably direct, or proximate, way responsible for [their] loss." *Sands Point Partners, L.P. v. Pediatrix Medical Group, Inc.*, Civ. No. 99–6181, 2000 U.S. Dist. LEXIS 22349, at \*12 (S.D.Fla. Jan. 19, 2000) (*citing Robbins v. Kroger Properties, Inc.*, 116 F.3d 1441 (11th Cir.1997)). On the face of the Complaint and other documents that I have judicially noticed, Plaintiffs have failed to allege with specificity that Defendants' fraud, as opposed to general market conditions, caused the stock price to decline. Thus, they have not sufficiently alleged causation.

Plaintiffs allege that they sustained damages as a result of stock prices dropping after Defendants finally disclosed the truth on April 8, 2002. By that date, however, Answerthink's stock had already dropped from $34.75 to $7.01. According to a graphical illustration in the Complaint, Answerthink's stock had already decreased from the Class Period high of over $34 per share to below $10 before any disclosures were made. ¶ 14. Thus, Plaintiffs' allegations themselves are insufficient to allege loss causation.

In their Opposition, Plaintiffs argue that stock prices also fell after Defendants' partial disclosures. Prior to the Company's press release on December 19, 2000, announcing, among other things, an increase in its reserves for bad debts, the stock price was $4.44. *See* RJN Exh. A. Following the press release, the stock traded between $2.98 (on December 20, 2000) and $9.99 (on June 29, 2001) throughout the remainder of the class period, closing at $5.97 on April 25, 2002, the last day of the class period. *See id.* These exhibits show that the stock quickly rebounded. Thus, based on Plaintiffs' allegations in the Complaint, and based on the other documents which I can judicially notice at the motion to dismiss stage, Plaintiffs have failed to adequately allege that Defendants' false statements were in some reasonably direct way responsible for their loss.

**VII. Section 20(b) Claim**

Because the Court dismisses the § 10(b) and 10b–5 claims against Defendants, the Court also dismisses the § 20(b) claim. *See Malin v. Ivax Corp.*, 17 F.Supp.2d 1345, 1351 ("Of course, without a primary violation of the securities laws, there can be no secondary violation under § 20(a).") (citation omitted).

**VIII. Conclusion**

Plaintiffs' claims of overstated revenue, low reserves, and inappropriate and non-disclosed related party transactions are insufficient to meet the standard of pleading fraud with particularity because they fail to allege that Defendants acted with the requisite scienter and made statements that they knew were materially false at the time. Additionally, Plaintiffs have failed to establish loss causation. Accordingly, both counts of the Complaint are DISMISSED WITHOUT PREJUDICE, and it is hereby **ORDERED AND ADJUDGED**:

1. Defendants' Motion to Dismiss Amended Complaint (DE # 48) is GRANTED.

2. Plaintiffs Counts I and II are DISMISSED WITHOUT PREJUDICE. Plaintiffs shall have **twenty (20) days from the date of the issuance of this Order** in which to serve a Second Amended Complaint in compliance with the Reform Act's pleading requirements. Failure to file a Second Amended Complaint by this date will result in the Amended Complaint being dismissed with prejudice and the case being closed.